# William Goldman Theatres, Inc. *v.* Dana (et al., Appellant).

Argued March 21, 1961.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Anne X. Alpern,* Attorney General, with her *Lois G. Forer,* Deputy Attorney General, for State Board of Motion Picture Control and Superintendent of Public Instruction, appellants.

*Edwin P. Rome,* with him *Morris L. Weisberg,* and *Blank, Rudenko, Klaus & Rome,* for appellees.

*Bernard G. Segal,* with him *Samuel D. Slade, Arlin M. Adams, William A. Schnader,* and *Schnader, Harrison, Segal & Lewis,* for appellees.

*William B. Ball,* with him *John H. Bream,* for amicus curiae.

*Matthew W. Bullock, Jr.* and *Julian Goldberg,* for American Civil Liberties Union, amicus curiae.

OPINION BY MR. CHIEF JUSTICE JONES, July 26, 1961:

The Commonwealth appeals from separate decrees of the court below in two suits, which respectively ad-

judged the Motion Picture Control Act of September 17, 1959, P. L. 902, 4 PS §70.1 et seq., unconstitutional.

The first suit (Appeal No. 22) was instituted by William Goldman Theatres, Inc., and Pennsylvania Association of Amusement Industries by William Goldman Theatres, Inc., Trustee ad litem, seeking to enjoin the members of the Pennsylvania State Board of Motion Picture Control from enforcing any of the provisions of the Act and to relieve the plaintiffs and all others similarly situated from registering under the Act or from complying with any of its provisions. The members of the Motion Picture Control Board were appointed by the Governor pursuant to the Act of 1959, supra. The other suit (Appeal No. 23) was instituted by Twentieth Century-Fox Film Corporation, as a taxpayer's bill, for itself and all others similarly situated, for the purpose of enjoining the fiscal officers of the Commonwealth and the Superintendent of Public Instruction from expending any funds of the Commonwealth appropriated by Section 16 of the Act or from any other appropriation made for the enforcement of the Act. Twentieth Century's complaint also prayed that the members of the Board of Motion Picture Control be restrained from taking any proceedings pursuant to the provisions of the Act. Both appeals will be disposed of in this one opinion.

In *Hallmark Productions, Inc. v. Carroll*, 384 Pa. 348, 121 A. 2d 584 (1956), the Motion Picture Censorship Act of May 15, 1915, P. L. 534, as amended by the Act of May 8, 1929, P. L. 1655, was stricken down as unconstitutional on the ground that the standards prescribed for the Board of Censors' disapproval of submitted films for public showing were so vague and indefinite in their statutory connotation as to offend the due process clause of the Fourteenth Amendment of the Federal Constitution. Consideration of the question of pre-censorship in that case was deemed unnecessary to

the decision and, consequently, was expressly not passed upon, Mr. Chief Justice STERN saying for the court in that connection (p. 358), "It is not necessary for us to consider . . . whether, however amended and 'clearly drawn,' any statute censoring motion pictures must be held to be unconstitutional on the theory that motion pictures are as much entitled to the protection of the constitutional guaranty of free speech as is now enjoyed by newspapers, magazines, books, theatrical exhibitions, radio and television scripts."

At all events, it is not open to question that motion pictures for public exhibition are entitled to the constitutional guarantee of free speech and free press. In *Burstyn v. Wilson*, 343 U. S. 495, 502 (1952), the Supreme Court of the United States succinctly declared that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments."

These constitutionally protected freedoms are not, of course, absolute. But, where a restrictive statute is made to operate in the area of individual liberty, "the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. Cf. Schneider v. State, 308 U. S. 147; Cantwell v. Connecticut, 310 U. S. 296; Prince v. Massachusetts, 321 U. S. 158. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions": *Thomas v. Collins*, 323 U. S. 516, 529-530 (1945).

Apart from the Fourteenth Amendment, the guarantee of free communication of thought and opinion is independently protected by our State Constitution of 1874. Article I, §7, thereof recognizes and declares that "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, *being*

*responsible for the abuse of that liberty.*" (Emphasis supplied). This provision is a direct inhibition on previous restraint of an exercise of the protected rights and was derived, *ipsissimis verbis,* from Section 7 of Article IX of our State Constitution of 1838 where, in turn, it had been taken from the Constitution of 1790. The members of the Convention which drafted that Constitution were undoubtedly fully cognizant of the vicissitudes and outright suppressions to which printing had theretofore been subjected in this very Colony.[1]

Although the provision in Article I, §7, of the Pennsylvania Constitution, as above quoted, has never heretofore been interpreted by this court in present context, it is clear enough that what it was designed to do was to prohibit the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege. History supports this view. After the demise in 1694 of the last of the infamous English Licensing Acts, freedom of the press, at least freedom from administrative censorship, began in England, and later in the Colonies, to assume the status of a "common law or

---

[1] In 1689 William Bradford, a young printer, who had introduced the art of printing to the middle provinces of America, had printed the Charter of the Province so that the people could see their rights. Apparently anticipating trouble, he had not put his name on the pamphlet. He was summoned none the less before the Governor of the Colony where the following colloquy took place: Governor: "Why, sir, I would know by what power of authority you thus print? Here is the Charter printed!" Bradford: "It was by Governor Penn's encouragement I came to this Province and by his license I print." Governor: "What, sir, had you license to print the Charter? I desire to know from you, whether you did print the Charter or not, and who set you to work?" See Griswold, The Fifth Amendment Today, Harvard University Press, 1955, citing John William Wallace, An Address Delivered at the Celebration by the New York Historical Society, May 20, 1863, on the 200th Birthday of William Bradford, Albany, 1863.

natural right." See *State v. Jackson,* 224 Ore. 337, 356 P. 2d 495, 499 (1960). Blackstone so recognized (circa 1767) when he wrote, "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity. To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government. But to punish (as the law does at present) any dangerous or offensive writings, which, when published, shall on a fair and impartial trial be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundations of civil liberty. Thus the will of individuals is still left free; the abuse only of that free will is the object of legal punishment. Neither is any restraint hereby laid upon freedom of thought or inquiry: liberty of private sentiment is still left; the disseminating or making public of bad sentiments, destructive of the ends of society, is the crime which society corrects,": 4 Bl. Comm. 151-152, (footnote omitted).

What Blackstone thus recognized as the law of England concerning freedom of the press came to be, 130 odd years later, an established constitutional right in Pennsylvania as to both speech and press; Article IX, §7, of the Constitution of 1790 so ordained; and, as al-

ready pointed out, the provision still endures as Article I, §7, of our present Constitution.[2]

We come then to consider the provisions of the Motion Picture Control Act of 1959, in the interpretation whereof the usual presumption of legislative validity must, in keeping with the pronouncement of the Supreme Court in *Thomas v. Collins,* supra, be weighed against "the great, the indispensable democratic freedoms" whose preferred status in our scheme of local government is secured by Article I, §7, of our State Constitution. No matter how laudably inspired or highly conceived a sumptuary statute may be, if its restrictions impinge upon the freedoms of the individual, as constitutionally guaranteed, it cannot stand. The harm to our free institutions, which the enforcement of such a statute would entail, would be of far greater portent than the evil it was designed to eradicate.

The Act of 1959 requires any person intending to sell, lease, lend, exhibit or use any motion picture film, reel or view (defined as "what is usually known as a stereopticon view or slide or . . . one or more frames of a motion picture film") to register with the Board and to notify the Board within 48 hours before the first showing thereof in Pennsylvania of the time and place of such showing. Upon the request of the Board at any time after such showing the registrant must furnish the Board with an exact copy of such film, reel or view for examination. A registrant must pay an annual registration fee of one dollar, and for the listing of the first showing of each film, reel or view, a fee of fifty cents for each 1,200 lineal feet or less.

The Board is empowered to examine any film, reel or view which has been exhibited at least once in Penn-

---

[2] It was, of course, not until the Fourteenth Amendment was adopted in 1868 that the freedoms of speech and press were accorded *federal* protection against adverse *state* action.

sylvania, and if a majority of the members of the Board are of the opinion that the film, reel or view is "obscene," the same shall be disapproved. If a majority of the members of the Board are of the opinion that the film, reel or view is "unsuitable for children," the same shall be disapproved for exhibition to children.

A child is defined by the Act as "any person less than seventeen years of age." A film, reel or view is obscene, according to the Act, "if to the average person applying contemporary community standards its dominant theme, taken as a whole, appeals to prurient interest." A film, reel or view is unsuitable for children, according to the Act, if it "is obscene or . . . incites to crime." Incites to crime is defined as that "which represents or portrays as acceptable conduct or as conduct worthy of emulation the commission of any crime, or the manifesting of contempt for law."

At the end of each week, or earlier if the Board so desires, it shall cause to be published a record of all films, reels and views which it has disapproved or disapproved for exhibition to children.

If an aggrieved registrant appeals from the Board's ruling, his film, reel or view will be promptly re-examined in his presence by at least two members of the Board and the ruling affirmed, reversed or modified. An aggrieved registrant has a right to appeal from the latter decision to the court of common pleas of the proper county.

The Board may apply to the court of common pleas of any county in which a film, reel or view which has been disapproved or disapproved as unsuitable for children is being shown or is about to be shown for an injunction to restrain its showing. Upon the affidavit of a member of the Board that the film, reel or view has been disapproved or disapproved as unsuitable for children the court may issue a preliminary injunction.

Section 8 of the Act prohibits the sale, lease, loan, exhibition or use of any film, reel or view which has been disapproved by the Board, and prohibits the exhibition to children of any film, reel or view which has been disapproved by the Board as unsuitable for children.[3] Section 11 of the Act prohibits any person from causing to be printed or displayed in Pennsylvania any advertising matter to aid in or advertise the showing of any film, reel or view which has been disapproved by the Board, whether or not the showing is to be held in Pennsylvania.

Section 13 makes the violation of any provision of the Act a criminal offense subject to a fine of from $500 to $1,000 or a prison sentence not exceeding 6 months, or both.

Section 14 provides that the Act "does not apply to any sale, lease, loan, exhibition or use of films, reels or views for purely educational, charitable, fraternal, family or religious purpose by any religious association, fraternal society, family, library, museum, public school or private school, or to any sale, lease, loan, exhibition or use of films, commonly known as industrial, business, institutional, advertising or training films, or films concerned exclusively with the advancement of law, medicine and other professions: Provided, That any such film is not exhibited or to be exhibited in theatres or in public places of entertainment commonly used as such."

The Act is clearly invalid on its face. It is designed to effect, in violation of Article I, §7, of the Pennsylvania Constitution, a pre-censorship of the exercise of the individual's right freely to communicate thoughts and opinions. Section 3 of the Act expressly

---

[3] This Section excludes from its purview films or reels "containing current news, events or happenings, commonly known as news reels."

restrains the initial showing of a film for 48 hours after notice to the Board of its intended exhibition; and subsequent showings are likewise subjected to previous restraint for the reason that, if the motion picture is exhibited after the censors have disapproved it, the exhibitor may be criminally punished upon proof, *not of showing a picture that is obscene or unsuitable for children,* but *merely upon proof of showing a picture the exhibition of which had been priorly restrained by the administrative action of the Board of Censors.*

And, concomitantly, the Act offends, additionally, Article I, §§6 and 9, of the Pennsylvania Constitution. Section 6 prescribes that "Trial by jury shall be as heretofore, and the right thereof remain inviolate", while Section 9 provides that "In all criminal prosecutions the accused hath a right to . . . a speedy public trial by an impartial jury of the vicinage; . . . nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the the land." No provisions in the Pennsylvania Constitution are more fundamental to the liberty of the individual. What they ordain is that the individual is entitled to a public trial by an impartial jury of the vicinage in every situation in which he would have been entitled to such a trial at the time of the adoption of our State Constitution of 1790 and ever since under our succeeding constitutions. See *Premier C. & B. Co. v. Pa. Alcohol P. B.,* 292 Pa. 127, 133, 140 Atl. 858 (1928); *Rhines v. Clark,* 51 Pa. 96, 101 (1866); *Commonwealth v. Wesley,* 171 Pa. Superior Ct. 566, 91 A. 2d 298 (1952); *Commonwealth ex rel. v. Heiman,* 127 Pa. Superior Ct. 1, 190 Atl. 479 (1937).

The utterance of obscene matter was a crime at common law for which a defendant chargeable therewith was entitled to a trial by jury. This was likewise so under similar guarantees in the Constitution of 1790 and 1838, long before the adoption of our present Con-

stitution. *Commonwealth v. Sharpless,* 2 S. & R. 91 (1815). See *Barker v. Commonwealth,* 19 Pa. 412 (1852) ; also *Commonwealth v. Blumenstein,* 396 Pa. 417, 419, 153 A. 2d 227 (1959). The above quoted provisions of Sections 6 and 9 of Article I guarantee that a person can be found guilty of a crime of the indicated description *only if* an impartial jury of the vicinage is of the opinion that his utterance was obscene, i.e., only if twelve jurymen are of the opinion that, applying contemporary standards in the community, the dominant theme of the utterance taken as a whole appealed to the average person's prurient interest.

What the Act in controversy purports to do is to place in the hands of three persons, selected by the Governor, the power, throughout the State, to judge and condemn motion picture films, reels, and views as obscene. Once a majority of them disapprove a film, reel or view, any person who sells, leases, lends, exhibits or uses it in Pennsylvania or advertises its showing within or without the Commonwealth may be prosecuted for so doing. Upon such prosecution the defendant would not be entitled to the right he constitutionally possesses and has heretofore been accorded, that of having twelve members of an impartial jury of the vicinage pass upon whether or not, applying contemporary standards of the community from which the jurors have been drawn, the dominant theme of his utterance taken as a whole appealed to the prurient interest of the average person. What the Act, if sustained, would effect would be to reduce the jury's function to a simple determination of whether or not the defendant did the physical act condemned by the statute, for example, exhibiting an administratively disapproved film.

Apart from the Act's limitation, an individual has a right to interrogate prospectively those who would pass upon his utterance, to challenge any of them for cause, and to challenge a permitted number of them

peremptorily. But, under the Act a defendant would have no such right of challenge, even for cause, as to any of the three gubernatorially appointed censors. In fact, the sole qualification they need present is that they are residents of Pennsylvania.

Since one accused cannot constitutionally be punished for the utterance of alleged obscene matter except upon a finding by an impartial jury of the vicinage that the matter was in fact obscene, such result cannot be achieved by the artful device of granting to administrative officials the power to disapprove the utterance if they think it is obscene, prohibit the sale, lease, loan, exhibition or use of anything so disapproved and impose a criminal penalty for a violation of their prohibition. Constitutionally protected rights are not to be so adroitly subverted. It follows that the Motion Picture Control Act of 1959, in its deprivation of the individual's right to have "an impartial jury of the vicinage" pass upon the issue of whether or not his utterance was obscene, violates Article I, §§6 and 9, of the Pennsylvania Constitution.

The appellant places great reliance upon *Times Film Corporation v. City of Chicago*, 365 U. S. 43 (1961), in which the United States Supreme Court, by a five to four decision, ruled that a particular section of a Chicago ordinance "requiring the submission of films prior to their public exhibition [was] not, on the grounds set forth, void on its face."[4] That case in

---

[4] Subsequent to the decision in the *Times Film Corporation* case, the United States Court of Appeals for the Seventh Circuit, in a unanimous opinion, vacated the judgment of a Federal District Court, which had affirmed a refusal by Chicago authorities, acting pursuant to the same ordinance, to grant a permit for the showing of a motion picture film. The Court of Appeals held that the censoring violated procedural due process of law because, (1) the would-be exhibitor was not afforded a full and fair hearing, (2) was not granted an opportunity to present evidence of con-

no way involved the rights guaranteed the individual by the Pennsylvania Constitution. Moreover, the opinion of the Court expressly declined to deal with "any statutory standards employed by the censor or procedural requirements as to the submission of the film."

The Motion Picture Control Act of 1959, in its defective censorial standards and the failure of its procedural requirements to safeguard adequately the constitutionally protected rights of freedom of expression, whether by speech or press, violates both the "due process" clause of the Fourteenth Amendment of the Federal Constitution and the "law of the land" provision in Article I, §9, of the Pennsylvania Constitution.

The definition of obscenity, as used in the Act of 1959, was obviously culled from the opinion of the United States Supreme Court in *Roth v. United States,* 354 U. S. 476, 489 (1957) in an attempt to satisfy the due process requirement of clarity under the Fourteenth Amendment. But, the definition of obscenity there enunciated has never been approved by the Supreme Court other than in the context of a criminal proceeding; and there is good reason why this is so. A criminal proceeding ordinarily means a trial by jury of the vicinage. The members of the jury represent a cross-section of the community in which the allegedly obscene utterance was made. The jury naturally possesses a special aptitude for reflecting the view of the "average person" of the community. A determination of whether or not a particular utterance is obscene requires, by the Act's own definition, an appraisal of its

temporary community standards, (3) responsible city officials failed to view the film as a whole, and (4) there were no standards for selection of the members of the Film Review Board and no safeguards to preclude an entirely arbitrary judgment on the Board's part. See *Zenith International Film Corporation v. City of Chicago,* 291 F. 2d 785 (June 20, 1961).

quality according to the average person's application of contemporary community standards.

However, the appellant contends that the word "community" as used in the Act's definition of obscenity should be interpreted to mean "Commonwealth of Pennsylvania", that a definitive contemporary standard of morality exists for the State as a whole, and that the three gubernatorially appointed censors are capable of determining just what this standard is in any particular circumstances of time and place. The contention is patently specious. A "community" in relation to standards of morality is a regional, and not a political, entity. Obviously the moral standards of the average resident of a metropolitan area are not the same as the moral standards of the average resident of a rural county.

Even if there were a definitive contemporary standard of morality applicable to the State as a whole, there is no guarantee that the censors appointed under the Motion Picture Control Act would be capable of ascertaining it. The only qualification for membership on the Board of Censors is that the appointees be "residents of Pennsylvania." No minimum requirements of academic education or sociological training is necessary. Indeed, it is possible under this statute to have uneducated, or even illiterate, persons ruling upon whether or not motion pictures of published and easily obtainable literary works are obscene. And, all this, without even a hearing on the point!

It is highly significant, moreover, that the Supreme Court in defining the term "obscenity", as applied in the criminal proceeding involved in the *Roth* case, stipulated that the allegedly obscene utterance must be considered "as a whole." Yet, the Act, here under consideration, empowers the censors to condemn not only an entire motion picture film and an individual reel of a film as well, but it expressly authorizes the cen-

sors to condemn a single "view", which the Act defines as "one or more frames of a motion picture film." Thus, under the statute, the Board of Censors need not consider a motion picture film "as a whole" but may censor any individual frame separately and slice the film accordingly. Such a procedure for applying the standard of "obscenity" has never yet been sanctioned by the Supreme Court.

The Act empowers the Board to disapprove a film, reel or view for exhibition to children if it "represents or portrays as acceptable conduct or as conduct worthy of emulation the commission of any crime or the manifesting of contempt for law." This standard is broad enough to empower the Board to disapprove for exhibition to children (i.e., persons under 17 years of age according to the Act) a large portion of films depicting historical, including Biblical, events. There is no need here to catalogue the many such instances that will readily come to mind upon a moment's reflection.

It is abundantly evident that the Act of 1959 empowers the censors to trespass too far upon the area of constitutionally protected freedom of expression. As the Supreme Court said in *Winters v. New York*, 333 U. S. 507, 509-510 (1948) : "It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment. Stromberg v. California, 283 U. S. 359, 369; Herndon v. Lowry, 301 U. S. 242, 258. A failure of a statute limiting freedom of expression to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expressions, protected by the principles of the First Amendment, violates an accused's rights under procedural due process and freedom of speech or press."

So far as the procedural protection afforded by the Act to those who exercise their right of free speech, which the Attorney General stresses, is concerned, it is to be borne in mind that "since only considerations of the greatest urgency can justify restrictions on speech, and since the validity of a restraint on speech in each case depends on careful analysis of the particular circumstances . . . the procedures by which the facts of the case are adjudicated are of special importance and the validity of the restraint may turn on the safeguards which they afford.": *Speiser v. Randall,* 357 U. S. 513, 521 (1958).

Section 4 of the Act, which requires each person who intends to sell, lease, lend, exhibit or use any motion picture film, reel or view in Pennsylvania to pay to the Board an annual registration fee of $1, and for the listing of the first showing of each film, reel or view a fee of 50 cents for each 1,200 lineal feet or less, is a plain attempt to tax the exercise of the right of free speech, a right that exists wholly apart from State authority and whose utilization a State may not, therefore, license. In *Murdock v. Pennsylvania,* 319 U. S. 105, 113 (1943), the Supreme Court declared that "A state may not impose a charge for the enjoyment of a right granted by the Federal Constitution." The brief of the Commonwealth on these appeals makes no attempt whatsoever to justify the fees imposed by Section 4 of the Act.

Section 5 of the Act purports to empower the Board to disapprove, or disapprove for exhibition to children, any film, reel or view which has been exhibited at least once in Pennsylvania without any hearing or any opportunity for any person to present testimony of any kind regarding the contents of the film, reel or view, or the contemporary community standards to be applied in judging it, or any other relevant matter. The Act prohibits the sale, lease, loan, exhibition, use or

the causing to be printed or displayed in Pennsylvania of any advertising matter to aid in or advertise the showing of any film, reel or view from the moment of its disapproval, with criminal sanctions for violation of the prohibition, regardless of whether or not an appeal to the court of common pleas from the Board's ruling has been taken and regardless of whether or not an appealed ruling is ultimately reversed by the court.

Section 9 grants to "[a]ny registrant who *was* exhibiting, selling, lending, leasing, or using any film, reel or view which film, reel or view has been disapproved or disapproved as unsuitable for children" a right to appeal from the ruling in which case "such film, reel or view will be promptly re-examined in the presence of such registrant by two or more members of the board . . . ." (Emphasis supplied). Here, again, there is no provision for a hearing and no opportunity for the registrant to present testimony of any sort. The Board is required to affirm, reverse or modify its ruling "promptly after such re-examination with the right of appeal from the decision of the board to the court of common pleas of the proper county."

The provision last above quoted is identical with the provision for appeal from a ruling of the Board to the court of common pleas of the proper county contained in Section 26 of the Motion Picture Censorship Act of May 15, 1915, 4 PS §54. In construing that provision this court interpreted it to mean that the appellant was not entitled to a trial *de novo* in the court of common pleas and that, to gain a reversal, he must prove that the administrative board abused its discretion; and that the burden of showing such abuse of discretion was upon the appellant. In *Goldwyn Distributing Corporation,* 265 Pa. 335, 342, 108 Atl. 816 (1919), this Court said, "The only question raised on this appeal was whether the board of censors, in disallowing the reels and films submitted, had exercised an honest

discretion or had unreasonably and arbitrarily rejected them . . . Where such inquiry arises the investigation starts with the presumption that the tribunal making the order or decree appealed from acted within the reasonable scope of its power and discretion, and it can be called to answer only as the party complaining, upon whom rests the burden, can show that the decision of the board rests on some ground that did not authorize the exercise of discretion." See also *Franklin Film Mfg. Corporation,* 253 Pa. 422, 98 Atl. 623 (1916). "[W]hen a court of last resort has construed the language, used in a law, the Legislature in subsequent laws on the same subject matter intend the same construction to be placed upon such language . . . ." Statutory Construction Act of May 28, 1937, P. L. 1019, §52(4), 46 PS §552(4).

In *Speiser v. Randall,* supra, the Supreme Court of the United States declared unconstitutional a California statutory procedure which placed the burden of proof upon applicants for a tax exemption (by requiring them to sign a "loyalty oath") to show that they did not advocate the overthrow of the government of the United States or the State by force or violence or other unlawful means or did not advocate the support of a foreign government against the United States in the event of hostilities, in order to qualify for a tax exemption. Holding that such procedure contravened constitutionally protected freedom of speech, the Supreme Court said (at pp. 526 and 529): "The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken fact finding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State

must bear these burdens. This is especially to be feared when the complexity of the proofs and the generality of the standards applied . . . provide but shifting sands on which the litigant must maintain his position. How can a claimant whose declaration is rejected possibly sustain the burden of proving the negative of these complex factual elements? In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free. 'It is apparent that a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions.' Bailey v. Alabama, 219 U. S. 219, 239. . . . Since the entire statutory procedure, by placing the burden of proof on the claimants, violated the requirements of due process, appellants were not obliged to take the first step in such a procedure."

If the Board disapproves, or disapproves for exhibition to children, any film, reel or view, the prohibition upon its sale, lease, loan, exhibition or use and, also, the prohibition upon causing to be printed or displayed in Pennsylvania advertising matter to aid in or advertising its showing, restricts the future conduct of all persons. Yet a right to appeal from the Board's ruling is granted only to persons who have in the past exhibited, sold, lent, leased or used the film, reel or view. Even a person who has advertised the showing of the film, reel or view, but who has not yet exhibited, sold, lent or used it, has no right of appeal. The constitutionally protected right of a free press is here involved because national magazines and out-of-State newspapers would be prohibited from circulation in Pennsylvania unless they deleted from their pages any adver-

tisement for, or news articles or reviews commenting favorably upon, any motion picture film which was disapproved by the Board. Out-of-State television stations whose programs are broadcast in Pennsylvania would violate this Act if they carried an advertisement for a motion picture film which had been disapproved by the Pennsylvania Board of Censors. The constitutionally protected rights of free communication of thought and opinion of all of these persons can easily be encroached upon through an enforcement of the Act without even the semblance of a hearing or an explanation of the reason for the Board's action.

Finally, under Section 10 of the Act the Board may apply to the court of common pleas of any county in which a film, reel or view which has been disapproved is being or is about to be shown, or in which any film, reel or view which has been disapproved as unsuitable for children is being or is about to be shown, for an injunction to restrain such showing. The court may issue an injunction upon such application merely on the affidavit of any member of the Board that the film, reel or view has been disapproved, or disapproved as unsuitable for children. No provision for a hearing and no opportunity to present evidence at all is granted to the defendant. The failure of the Act to protect adequately the constitutionally guaranteed rights of persons affected by the Board's ruling by granting them a proper hearing constitutes a flagrant violation of procedural due process.

Since the Motion Picture Control Act of 1959 plainly violates both our State and Federal Constitutions in the particulars hereinabove pointed out, it follows that the decrees of the court below adjudging the Act unconstitutional and void must be affirmed.

The decrees appealed from at Nos. 22 and 23 are separately affirmed at the appellant's cost in each case.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

During the last five years this Court has dismantled the three most formidable dikes constructed by the people of Pennsylvania, through their representatives in Harrisburg, against the flood of cinematic filth always pounding at the borders of our Commonwealth.

In 1956, in the *Hallmark* case, 384 Pa. 348, this Court, by declaring an Act of 1915 unconstitutional, dissolved the Motion Picture Censorship Board which, for forty-one years, had faithfully served the people by keeping the theatres wholesome and clean of obscenity, vulgarity, blasphemy and profanity. At the time of that decision, the Majority of this Court said that although its decision eliminated motion picture censorship this did not mean that objectionable films could not be suppressed since offending exhibitors could be prosecuted under the criminal code.

Then, in 1959, in *Commonwealth v. Blumenstein*, 396 Pa. 417, this Court proceeded to strike down that section of the criminal code under which exhibitors of immoral pictures could be prosecuted, by declaring it unconstitutional. The parent law of that section of the code (§528, The Penal Code of 1939), had been the Act of April 13, 1911, P. L. 64, so that this legislation which the Court invalidated had served the people of Pennsylvania faithfully for forty-eight years.

And then, also in 1959, the Majority of this Court, in *Kingsley International Pictures Corporation v. Blanc*, 396 Pa. 448, ruled that a district attorney could be enjoined from seizing a film which he regarded as violating the laws of Pennsylvania, because of obscenity. I wrote a dissenting opinion in that case, as I did in the previous ones, and ended that dissent as follows: "Unless the General Assembly comes to the aid of the people with renewed legislation and William Penn comes down from his pedestal atop City Hall to protect the State he founded, against the forces of im-

morality at our borders, far more damaging to the welfare of the people than the Indians he encountered, the fair Commonwealth which he dedicated to religious freedom, civic liberties and moral purity, may well be on the way to a cinematic Gomorrah."

The General Assembly was, of course, well aware of its responsibilities to the people, and, thus, in September, 1959, it enacted the Motion Picture Control Act, which is the subject of this appeal. That the representatives were acting under a mandate of the people is well evidenced by the fact that the House of Representatives passed the measure by a near unanimous vote of 163 to 1, and the Senate approved it by the overwhelming majority of 47 to 3. The bill was, of course, approved and signed by the Governor.

Today this Court again, through its powers of interpretation and absolute decision, reduces another statute of the sovereign body of the Commonwealth to shreds of paper by declaring it unconstitutional.

In view of the fact that the highest tribunal in our State has now destroyed three statutes on the subject of motion picture sanitation, the people may well wonder what must be done to protect Pennsylvania from the evil of lascivious, pornographic, obscene and prurient motion pictures.

As matters presently stand, the appalling prospect presents itself that films of the most degrading character, films revealing scenes of outright degeneracy, may be projected without legal hindrance in Pennsylvania. Dealers may traffic in pictures on subjects of the utmost depravity, pictures which cannot help but corrupt morals and weaken the will of immature minds, pictures which would make an ancient Pompeiian blush with shame—dealers may engage in this type of revolting merchandise and not be restrained.

These four decisions of the Supreme Court of Pennsylvania have, in effect, bound prosecuting authorities

hand and foot. Officials charged with standing guard over the moral health of the people have been disarmed. Every weapon which they could employ to stop the wicked and nefarious business of immoral films has been torn from their grasp. The armory in this field has been stripped bare.

By vetoing the three statutes enumerated, this Court has virtually, in the particular subject matter under consideration, made of itself a super-chief executive or a super-Senate.

Does the Constitution of Pennsylvania demand what this Court has done? In *Com. ex rel. Shumaker v. N. Y. & Pa. Co.*, 367 Pa. 40, we said: "in construing the legislative intent, the Statutory Construction Act of May 28, 1937 . . . directs us to presume the intention of the legislature to be that it intends to favor the public as against any private interest."

Would it be difficult for this Court to presume that the General Assembly of Pennsylvania intended to favor the public which certainly is interested in protecting children from the contamination of visual and auditory contact with immoral exhibitions? In the *Blumenstein* case, supra, I said in my Dissenting Opinion, and I repeat it here: "Who can doubt that many juvenile delinquents have been consciously or unconsciously urged into lurid crime because of being repeatedly exposed to lurid and immoral motion pictures? Children are by nature imitative and when they see immorality being practiced on so extensive and expansive a medium of expression as the motion picture screen, is it strange if they conclude that there is nothing wrong about doing what is being publicly glorified?"

What is the rationale of the Majority's repudiation of the Motion Picture Control Act? It says that the Act violates the constitutional provision protecting free speech and freedom of the press. But freedom of

speech is not involved in the Act; much less freedom of the press.

Those who fear that motion picture regulation may lead to press censorship conjure up a wholly unnecessary fear. The American people would never stand for press censorship because the freedom of the press is one of the strongest bulwarks of our independence and well-being and has been so recognized by statutes and decisions of the nation's highest court. Here we stand unanimously as at Armageddon.

But, I repeat, freedom of the press and freedom of speech are wholly extraneous to what is before us in this lawsuit. To equate motion pictures with speech offends against logic and what is palpably demonstrable. The performance of speech involves only one person. And all that occurs is the formation of words. However, in motion pictures many persons participate. The audience watches these persons engaging in pantomine, gesture, gesticulations, postures, and movements which tell what words could never describe.

The Majority Opinion says: "Apart from the Fourteenth Amendment, the guarantee of free communication of thought and opinion is independently protected by our State Constitution of 1874."

But in motion pictures we are not dealing with the mere "communication of thought and opinion." Motion pictures certainly go beyond the communication of thought and opinion. Motion pictures may appeal to the senses, to the passions. Further comparison between mere words and the panorama, parade, and performance of motion pictures is not only bizarre but might even become unseemly.

The Majority Opinion goes back further than 1874. It recalls the Constitutional Convention of 1790 where the members of the Convention "were undoubtedly fully cognizant of the vicissitudes and outright suppressions

to which printing had theretofore been subjected in this very Colony." But what has printing in 1790 to do with the malignance of filthy motion pictures?

No one with the slightest awareness of what is happening in the world can fail to know that many motion picture producers have gone entirely too far in pandering to the baser passions. J. Edgar Hoover, Director of the Federal Bureau of Investigation, has said: "As a law enforcement officer and as an American citizen, I feel duty-bound to speak out against a dangerous trend which is manifesting itself in the field of film and television entertainment. In the face of the nation's terrifying juvenile crime wave, we are threatened with a flood of movies and television presentations which flout decency and applaud lawlessness. Not since the days when thousands filed past the bier of the infamous John Dillinger and made his home a virtual shrine have we witnessed such a brazen afront to our national conscience."

The well-known, popular and able columnist Bob Considine wrote of motion pictures in 1960 as follows: "So many of its current heroines are prostitutes, so many of its heroes wallow in a bed of neuroses, that churchmen interested in the morality of their flocks note that the number of objectional films has risen from 14 per cent in 1959 to 24 per cent this year."

Cardinal Cushing of Boston said in 1959: "We must all be concerned about the corruption of our youth. The survival of our nation depends upon the moral integrity of those who are being trained for tomorrow's social responsibilities."

The Reader's Digest for March, 1961, carried an article by Don Wharton, who spoke of what he saw walking along a street in New York City: "At the Criterion was *Girl of the Night*. ('She's beautiful enough to be a model, chic enough to be a debutante, desirable enough to be a wife—and special enough to be none of

these.') The management had installed telephones next to the sidewalk with a sign inviting pedestrians to call the call girl. 'Use these phones and listen to her *sizzling* conversation.' Those who did heard a sultry voice saying, 'I'm Bobbie Williams, your girl of the night. I've been waiting for *your* call.

"This is not a New York phenomenon. Similar exploitation of sex—illicit, perverted, sordid or glamorized—is seen all across the nation. . .

"In Circleville, Ohio, last fall, the leading theater's lobby was advertising three coming attractions: *Desire in the Dust* (torrid love, infidelity, physical and mental cruelty), *Girl of the Night* (prostitution) and *The Dark at the Top of the Stairs* (frigidity). In Cincinnati the next day, I dropped into a movie house showing *Psycho,* in which a girl is knifed by a psychotic while taking a shower . . . In this movie house, teenagers composed over half the audience."

The author points out that even the motion picture industry itself is protesting: "Attacks on objectionable pictures are coming even from people in the movie industry. Both state and national associations of exhibitors have officially protested the avalanche of films with oversexed themes, treatment and dialogue that they are getting from the producers."

One of the most popular motion picture stars of the day, John Wayne, whose production "Alamo"—which for sheer visual beauty, patriotic theme, and its moving story of self-sacrifice must be rated among the classics of the screen—said: "I don't like to see the Hollywood bloodstream polluted with immoral and amoral nuances. Filthy minds, filthy words and filthy thoughts have no place in films, which I see as a universal instrument at once entertaining peoples and encouraging them to work toward a better world, a freer world."

The whole vast library of material—articles, speeches, dissertations and studies on immoral motion pictures—was before the Legislature when it decided that it had to do something to protect the children of Pennsylvania from their corrosive influences.

The main and principal objective of the Motion Picture Control Act is to erect a palisade of protection around the keen sensitivity, the swift reactions, and the acute impressionability of minors who are such easy targets for the arrows of improper suggestion shot from the vantage point of the motion picture screen.

Pennsylvania has the right to pride itself on the solicitude it has always exerted in behalf of the welfare of children. The statute books glow with special laws shielding tender minds and bodies from inhuman treatment and cruelty, injurious labor conditions, and deleterious environments. Pennsylvania has enacted statutes to keep children off the streets after certain hours, it prohibits the sale of firearms to them.

For their own welfare and wellbeing, children may not obtain licenses, which are available to adults, they may not enter premises where intoxicating liquors are being dispensed. The State makes education compulsory for children. The State budget each year bulges with expenditures running into millions and millions of dollars, all designed to educate and protect children, to promote their health—physical, mental, moral and spiritual; to guide back to the path of moral and legal behavior those who have strayed into the woods and mire of delinquency.

It would take a book to describe only briefly what Pennsylvania does to educate, train, and equip the children of today to become the citizens of tomorrow to perpetuate the ideals on which this Commonwealth was founded and to which it has adhered in its entire glorious history.

It would be most extraordinary that in that book with instructions on how to rear the citizens of the future, there would be not a page on how to protect minors from the potentially dangerous influences of immoral exhibitions. The Legislature has recognized the need for that page and has inserted it into the book of instructions. This Court has torn it out, on the theory that it encroaches on the rights of those engaged in the business of this medium of entertainment, a medium which unquestionably possesses the potentialities of pernicious persuasion.

But the page which this Court has removed from the book of protection for children does not carry the encroachments which the Court envisages. There is nothing in the Motion Picture Control Act which denies anyone appeal to the courts whenever and wherever he believes his constitutional prerogatives have been invaded.

The regulations and control provided for in the Act are designed to protect the interests and the welfare of the special wards of any civilized state—the children. But in doing so it has, at the same time, refrained from imposing unfair burdens on the adult citizenry engaged in a perfectly legitimate and in fact laudible business enterprise.

The Act is not only not designed to injure the legitimate business of motion picture merchants. In fact, it will be helpful to them because it is obvious that the vast majority of films submitted for registration will be approved for showing, and dealers will thus be saved from a constant concern as to whether they may or may not be violating the law of the State and the law of morals.

The only films which will be restrained will be those which are obscene under a definition specifically laid down by the Supreme Court of the United States. If, in that perfectly fair and American manner of deal-

ing, some one may lose a temporary investment, he should not complain; he will only be paying what all citizens are required to pay in the maintenance of an organized, wholesome, and decent society.

Walter Lippmann, perhaps the most respected and admired news commentator of today, and a proved champion of human liberties and civil rights, sees no harm in restrictions on individual action; in fact he recommends them where the welfare of children is involved: "There can be no real doubt, it seems to me, that the movies and television and the comic books are purveying violence and lust to a vicious and intolerable degree. There can be no real doubt that public exhibitions of sadism tend to excite sadistic desires and to teach the audience how to gratify sadistic desires. Nor can there be any real doubt that there is a close connection between the suddenness of the increase in sadistic crimes and the new vogue of sadism among the mass media of entertainment . . . For my own part, believing as I do in freedom of speech and thought, I see no objection in principle to censorship of the mass entertainment of the young. *Until some more refined way is worked out of controlling this evil thing, the risks to our liberties are, I believe, decidedly less than the risks of unmanageable violence.*" (Emphasis supplied).

In its protection of individual liberty, the Constitution of the United States and that of Pennsylvania, too, does not advocate anarchy which, of course, is what unregulated and uncontained freedom would signify. Every man's freedom is limited to the extent that it interferes with somebody else's right to freedom. No one who is engaged in the business of motion pictures has the right, under the Constitution, to contaminate the mind of youth, just as no one, under the Constitutional guarantee of free speech, has the right to slander or libel his neighbor.

The Majority Opinion says that the Motion Picture Act is "clearly invalid on its face." In support of this strong statement it says that the Act "is designed to effect, in violation of Article I, §7 of the Pennsylvania Constitution, a pre-censorship of the exercise of the individual's right freely to communicate thoughts and opinions."

But here again, I repeat respectfully, the Majority confuses communication of thoughts and opinion, which is propelled by the medium of speech, with bodily vulgarity which can be conveyed by means of motion pictures in the most revolting forms.

The Majority Opinion quotes from *Burstyn v. Wilson,* 343 U. S. 495, that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." This, of course, is true but there is a modification to this pronouncement in the very same case, namely, *"It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places."* (Emphasis supplied).

And then, in *Roth v. United States,* 354 U. S. 476, the Supreme Court of the United States declared that "In light of . . . history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance."

Nor do I find in the Act the dangers which the Majority Opinion describes so alarmingly. The Majority Opinion shows how, once the majority of the board disapprove of a film, the exhibitor may be prosecuted for showing the condemned picture. In this the Majority Opinion sees a violation of the Constitutional right of trial by jury. I do not follow this argument. When State milk inspectors turn down a farmer's milk as being unfit for consumption, the farmer may not demand a jury to pass upon the quality of the milk. When

meat inspectors condemn certain meat as tainted, the butcher may not ask for a jury to smell the meat and count the organisms in it before the government may act. When a barber maintains an unhygienic shop and he is ordered to close his shop he may not insist that a jury be called to examine the sink and cuspidors before he may be cited for violating the health laws. In all these cases the alleged offender has the right to a jury trial *after* the government inspection has terminated just as the exhibitor of motion pictures will have the right to a jury trial in the event he is cited by the Board.

The Majority Opinion complains because an exhibitor would be required to pay the insignificant sum of $1 per year and 50 cents per 1,200 lineal feet, saying that this "is a plain attempt to tax the exercise of the right of free speech." In the first place, as I have already indicated, free speech is not involved here. In the second place, the insignificant fees mentioned are paid for a very important service rendered to the exhibitor by the State, namely, the ascertainment of what is obscene so that the exhibitor is relieved of that responsibility.

If a picture has been disapproved the exhibitor may not advertise its showing. The Majority Opinion sees here an infringement on the right of free press, asserting that "national magazines and out-of-State newspapers would be prohibited from circulation in Pennsylvania unless" the advertisements of the disapproved picture were deleted. This, of course, does not follow at all because the State of Pennsylvania, under the Interstate Commerce clause of the Constitution could in no way impede the free circulation of magazines and newspapers.

Then the Majority finds fault with the Act in that it does not provide that the members of the Motion Picture Control Board shall have "academic education or

sociological training." I would regard that absence of requirement as one of the virtues of the plan of review of film. The reaction to a motion picture, in so far as that reaction appertains to morality and decency, should be that of normal, average persons and not that of technicians trained in technical fields. Motion pictures, after all, are intended for entertainment and if they accomplish that purpose without offending against morals and good citizenship, they should be exhibited. The Majority Opinion allows itself a slight exaggeration when it says that the Board members could even be "uneducated or even illiterate, persons." To assume that a governor would appoint an illiterate person to a post which is bound to involve reading is to ascribe to the chief executive of the State an ignorance and sheer perversity, which even the most partisan minded opponent would hardly ever suggest.

The Motion Picture Control Act of 1959, like much good legislation, may need improvements later on, and they will undoubtedly be forthcoming by legislative amendment, but I cannot agree that it is unconstitutional and I certainly regret that this Court has now for the third time in five years nullified the action of the Legislature in a field which cries out for supervision and control.

So that there may be no misunderstanding about my position I want to add that I do not oppose motion pictures. On the contrary, I regard motion picture entertainment as the best form of relaxation extant. Color photography, the wide screen, and the miraculous equipment which reproduces music with such fidelity, volume and tone, that one can hardly believe that the orchestra is not actually in the theatre—all these magnificent features have made the motion picture theatre the rendezvous of relaxful diversion which even kings could not have dreamed of having fifty years ago. Classics in literature are being reproduced, educational

subjects are attractively handled, history is made to live again before one's entranced vision. Faraway places, which the unwealthy person would never have the money to visit, are being brought to us in all their original charm, quaintness, and dramatic picturesqueness.

Pictures like the *Alamo, Ben Hur, The Big Fisherman, The Big Country, The Ten Commandments* are more than entertainments; they are almost personal adventures and in many ways spiritual experiences. Masterpieces of this character, together with other dramatic gems are being endangered by the cheap, bawdy monstrosities referred to in the Reader's Digest article above quoted. Control such as that outlined in the Act before us will preserve films of historical magnitude and artistic perfection as it will also protect children.

The law-making body of this Commonwealth has tried a number of times to supply the motion picture control and protection which a decent, God-fearing, law-abiding, self-respecting and dignified people need, desire and demand.

I hope and urge that it will not lose heart, but in the spirit of William Penn, try and try again.

———

DISSENTING OPINION BY MR. JUSTICE EAGEN:

I cannot agree legally or morally with the reasoning or conclusion of the majority opinion.

The sole question presented is narrow and well defined. It is not whether we, in fact, approve and support censorship, rather is it: Does the statute involved violate certain guarantees imposed by the Federal and Pennsylvania Constitutions? In my opinion, it does not.

The majority decision rules that the provisions of the statute constitute a "pre-censorship" and is, there-

fore, an unlawful restraint upon the exercise of an individual's right to freely communicate thoughts and opinions. I disagree. The statute does not provide for pre-censorship.

"Prior restraint," as we construe court decisions, refers to administrative controls *prior to any publication,* such as licensing or other devices according to which no publication whatever may take place without prior approval of a public official. See, *Kingsley Books, Inc. v. Brown,* 354 U. S. 436 (1957); *Near v. Minnesota,* 283 U. S. 697 (1931); *Times Film Corporation v. City of Chicago,* 365 U. S. 43, 81 S. Ct. 391 (1961). There is a marked difference between "prior restraints" and "post restraints", as the first mentioned case pointedly so recognizes. The distinction is well stated in Freund, The Supreme Court And Civil Liberties, 4 Vand. L. Rev. 533, 538, 539: "The concept of prior restraint, roughly speaking, deals with official restrictions imposed upon speech or other forms of expression in advance of actual publication. Prior restraint is thus distinguished from subsequent punishment, which is a penalty imposed after the communication has been made as a punishment for having made it. Again, speaking generally, a system of prior restraint would prevent communication from occurring *at all;* a system of subsequent punishment allows the communication but imposes a penalty after the event. Of course, the deterrent effect of a later penalty may operate to prevent a communication from ever being made. Nevertheless, for a variety of reasons, the impact upon freedom of expression may be quite different, depending upon whether the system of control is designed to block publication in advance or deter it by subsequent punishment." (Emphasis supplied.) See also, Emerson, The Doctrine Of Prior Restraint, 20 Law and Contemp. Prob. 648 (1955).

The statute concerned does not require *approval before* one may show a motion picture. No license to do so is necessary. The Board's power of disapproval operates only post facto, and *only after* at least one public showing to any number of audiences has taken place, *and after* the Board has requested a copy of the film, examined it and passed upon it according to the narrowly drawn standards of the Act. *The film may then be disapproved only if it is in fact obscene.*

If, as the lower court reasoned and the majority opinion indicates, post restraints are to be legally equated with prior restraints then, the law is powerless to adequately control any obscene exhibitions, no matter how base they may be. Any possible censorship legislation in Pennsylvania is dead for all time. No civil restraint is ever possible on any form of speech, including picketing, use of sound trucks, advocacy of the violent overthrow of a lawful government, inciting riots, etc. What a sorry plight the people of this Commonwealth are in, if this is the law.

But, say the Majority, recourse may be had to the penal statutes. The exhibitor of an obscene movie may be prosecuted and punished. Is this adequate to meet the urgent public need to eradicate filthy and obscene motion pictures? Consider the facts realistically and without rose-colored glasses. An obscene exhibition occurs. The responsible individual is arrested and prosecuted. Months, yes many months and possibly years, go by before a final decision is recorded. In the meantime, the illegal exhibition continues in every town, hamlet and city throughout the land. Millions of men, women and children are exposed. The erosion of moral standards and the subtle evil of the public dissemination of such hard-core pornographic pictures has taken effect. The harm has been done. While the prosecution is in litigation, another such motion picture appears and is made available by another exhibi-

tor. Another arrest ensues. The evil effects continue and spread on ad infinitum.

No one has the moral or legal right to exhibit obscene movies. No one has the right to financial profit gained through moral corruption. Furthermore, a possible loss of investment presents no meritorious constitutional objection to a statute reasonably protecting a public interest of major importance. It is interesting to note in this case that the motion picture producers emphatically disclaim any intention of producing objectionable films. If this be so, why the great concern?

But let us assume, arguendo, that the statute under consideration does, in effect, provide for prior restraints. It is no less constitutional. Obscenity is not protected by either the Constitution of the United States or the Constitution of Pennsylvania. I believe the Majority will, undoubtedly, so accede. It is also now clearly established that *all* prior restraints are not per se invalid and do not automatically violate either the First or the Fourteenth Amendment to the United States Constitution.

In *Times Film Corporation v. Chicago,* supra, the Supreme Court in holding that the ambit of constitutional protection does not include complete and absolute freedom to exhibit, at least once, any and every kind of motion picture, stated, at 394 of 81 S. Ct: "Petitioner would have us hold that the public exhibition of motion pictures must be allowed under any circumstances. The State's sole remedy, it says, is the invocation of criminal process under the Illinois pornography statute, Ill. Rev. Stat. (1959), c 38, §470, and then only after a transgression. But this position, as we have seen, is founded upon the claim of absolute privilege against prior restraint under the First Amendment—*a claim without sanction in our cases.* To illustrate its fallacy we need only point to one of the 'exceptional cases' which Chief Justice HUGHES enumer-

ated in Near v. State of Minnesota ex rel. Olson, supra, namely 'the primary requirements of decency [that] may be enforced against obscene publications.' *Moreover, we later held specifically 'that obscenity is not within the area of constitutionally protected speech or press.'* Roth v. United States, 1957, 354 U. S. 476, 485, 77 S. Ct. 1304, 1309, 1 L. Ed. 2d 1498. Chicago emphasizes here its duty to protect its people against the dangers of obscenity in the public exhibition of motion pictures. To this argument petitioner's only answer is that regardless of the capacity for, or extent of such an evil, previous restraint cannot be justified. With this we cannot agree. We recognized in Burstyn, supra, that 'capacity for evil . . . may be relevant in determining the permissible scope of community control,' 343 U. S. at page 502, 72 S. Ct. at 780, and that motion pictures were not 'necessarily subject to the precise rules governing any other particular method of expression. Each method,' we said, 'tends to present its own peculiar problems.' At page 503 of 343 U. S. at page 79 of 72 S. Ct. Certainly petitioner's broadside attack does not warrant, nor could it justify on the record here, our saying that—aside from any consideration of the other 'exceptional cases' mentioned in our decisions—the State is stripped of all constitutional power to prevent, in the most effective fashion, the utterance of this class of speech. *It is not for this Court to limit the State in its selection of the remedy it deems most effective to cope with such a problem, absent, of course, a showing of unreasonable strictures on individual liberty resulting from its application in particular circumstances.* Kingsley Books, Inc. v. Brown, supra, 354 U. S. at page 441, 77 S. Ct. at page 1327." (Emphasis ours.)

The appellees in the present case had requested and were granted, twice, postponement of the oral argument of this case, pending the outcome of *Times Film*

*Corporation v. City of Chicago,* supra, alleging that it "involved a question intimately related to the instant appeals" and because the decision in that case "might control the outcome of these appeals." It did affect the outcome, although the Majority does not agree and tries to ignore it. As a result of that decision, the appellees were forced to abandon their argument before this Court that the Motion Picture Control Act of 1959 violated the First and Fourteenth Amendments of the United States Constitution, and argued instead that this Act violated Article I, Section 7 of the Pennsylvania Constitution. But this position does not hold water either, when scrutinized under the microscope of truth and law.

It is claimed that the framers of the Pennsylvania Constitution adopted an absolute prohibition against prior restraint, while the drafters of the First Amendment to the Federal Constitution accepted a lesser restriction. The fallacy of this is in its assumption that freedom from prior restraint was ever absolute in Pennsylvania. This is just not so. But unfortunately, the decision in this case supports this error. The majority opinion reasons that even though prior restraint, in exceptional cases, do not violate the First and Fourteenth Amendments of the United States Constitution, it does violate Article I, §7, of the Pennsylvania Constitution. In order to reach this conclusion, the Majority does a little selective picking from both Constitutions. They go first to the First and Fourteenth Amendments of the United States Constitution in order to bring motion pictures into the ambit of the constitutional guarantee of free speech and free press (*Burstyn v. Wilson,* supra) and imply, therefore, that Article I, §7, also covers motion pictures. But, they then reject the First and Fourteenth Amendments and one hundred seventy-one years of Pennsylvania law and state that the Pennsylvania Constitution is different

from the United States Constitution, and that the Pennsylvania Constitution prohibits *all* prior restraints—no matter how unlawful the publication may be, which, as pointed out before, is directly contrary to the United States Constitution. See *Times Film Corporation v. City of Chicago*, supra, and the cases cited therein. The Majority makes this deduction based on the fact that Article I, §7, directly originated from the Constitution of 1790, and that, therefore, "The members of the Convention which drafted that Constitution were undoubtedly fully cognizant of the vicissitudes and outright suppressions to which printing had theretofore been subjected in this very Colony." But, what they neglect to state is that the members of the Pennsylvania Constitutional Convention of 1790 were fully cognizant of the United States Constitution, which was adopted on September 17, 1787, by the Constitutional Convention in Philadelphia, in which *eight* of the forty members were from Pennsylvania. They were cognizant also of the first ten amendments to the Constitution which were adopted by Pennsylvania on March 10, 1790, less than six months before the adoption of the Pennsylvania Constitution. Furthermore, Thomas Mifflin, who was one of the eight delegates to the United States Constitutional Convention, was president of the Pennsylvania Constitutional Convention.

With these facts in mind, can anyone doubt that the delegates to the Constitutional Convention would be and were more influenced by the results of the United States Constitutional Convention, which also was aware of the long history of oppression, than by Blackstone, especially when eight of its most influential members comprised the largest delegation to the United States Convention.[1]

---

[1] The delegates from Pennsylvania were Benjamin Franklin, Thomas Mifflin, Robert Morris, George Clymer, Thomas Fitzsimons, Jared Ingersoll, James Wilson and Gouverneur Morris.

All one has to do is to compare both Constitutions and he will immediately see the similarity of ideas between the two. Furthermore, this Court, in construing Article I, §7, has always followed and relied upon the decisions of the United States Supreme Court interpreting the First Amendment. (See *Duquesne City v. Fincke,* 269 Pa. 112, 112 Atl. 130 (1920); *Duffy v. Cooke,* 239 Pa. 427, 86 Atl. 1076 (1913); *Spayd v. Ringing Rock Lodge,* 270 Pa. 67, 113 Atl. 70 (1921); *Commonwealth v. Widovich,* 295 Pa. 311, 145 Atl. 295, cert. denied, 280 U. S. 518 (1929); *Alliance Auto Ser., Inc. v. Cohen,* 341 Pa. 283, 19 A. 2d 152 (1941); *Commonwealth v. Gordon,* 66 Pa. D. & C. 101, aff'd sub nom.; *Commonwealth v. Feigenbaum,* 166 Pa. Superior Ct. 120 (1950), (opinion by Judge, now Mr. Justice Bok); *Wortex Mills v. Textile Workers U. of A.,* 369 Pa. 359, 85 A. 2d 851 (1952); *Fitzgerald v. Philadelphia,* 376 Pa. 379, 102 A. 2d 887 (1954); *Hallmark Productions, Inc. v. Carroll,* 384 Pa. 348, 121 A. 2d 584 (1956); *Mack Appeal,* 386 Pa. 251, 126 A. 2d 679 (1956); *Ullom v. Boehm,* 392 Pa. 643, 142 A. 2d 19 (1958); *46 S. 52nd St. Corp. v. Manlin,* 398 Pa. 304, 157 A. 2d 381 (1960)) as have all Pennsylvania courts from the time of the Constitution of 1790. See Charges to Grand Juries of the Counties of the Fifth Circuit District in the State of Pennsylvania, Sept. Session, 1798, Addison's Reports 270, 281.

Article I, §7, of the Pennsylvania Constitution contains the identical guarantees of freedom of speech and press as are contained in the First Amendment of the Federal Constitution. While the language is different, the concept is the same. The First Amendment of the United States Constitution reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Article I, §7, of the present Constitution of Pennsylvania reads: "The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases."

That the chief purpose of the protection of freedom of speech and press given by the First Amendment and incorporated into the Fourteenth Amendment of the United States Constitution and into Article I, §7, of the Pennsylvania Constitution, is to prevent previous restraints upon publications cannot be doubted. But, *"It has never been held that liberty of speech is absolute. Nor has it been suggested that all previous restraints on speech are invalid.* On the contrary, in Near v. State of Minnesota ex rel. Olson, 1931, 283 U. S. 697, 715-716, 51 S. Ct. 625, 75 L. Ed. 1357, Chief Justice HUGHES, in discussing the classic legal statements concerning the immunity of the press from censorship, observed that the principle forbidding previous restraint 'is stated too broadly, if every such restraint is deemed to be prohibited . . . . [T]he protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases.' These included, the Chief Justice found, utterances creating 'a hindrance' to the Government's war

effort, and 'actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.' In addition, the Court said that 'the primary requirements of decency may be enforced against obscene publications' and the 'security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.' Some years later a unanimous Court, speaking through Mr. Justice MURPHY, in Chaplinsky v. New Hampshire, 1942, 315 U. S. 568, 571, 572, 62 S. Ct. 766, 769, 86 L. Ed. 1031, held that there were 'certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.' " *Times Film Corporation v. City of Chicago,* supra, at 393, 394 of 81 S. Ct. So, too, our Court has on many occasions stated that freedom of speech is not absolute and is subject to prior restraints in certain instances.[2] In *Commonwealth v. Widovich,* supra, at p. 317, Mr. Justice (later Chief Justice) KEPHART speaking for a unanimous court stated, "The legislature, under the police power, . . . may prohibit the teaching or advocacy of a revolution or force as a means of redressing supposed injuries, or effecting a change in government. See Buffalo Branch, Mutual Film Corp. v. Breitinger, 250 Pa. 225; White's App., 287 Pa. 259, and cases there referred to. It is true that section 7 [of the Pennsylvania Constitution] is a part of the Bill of Rights, but overshadowing these rights is the authority of the government to preserve its existence under the

---

[2] See also White, Commentaries on the Constitution of Pennsylvania, p. 86 (1907), "Immoral publications, however, may be suppressed" under the Pennsylvania Constitution.

police power. Article XVI of the Constitution says, 'the police power shall never be abridged.' This relates to all phases of its exercise. The police power is the greatest and most powerful attribute of government; on it the very existence of the state depends: 6 R.C.L. 183; District of Columbia v. Brooke, 214 U. S. 138; Bank v. Haskell, 219 U. S. 104; Eubank v. Richmond, 226 U. S. 137. If the exercise of the police power should be in irreconcilable opposition to a constitutional provision or right, the police power would prevail: Jacobson v. Massachusetts, 197 U. S. 11, 25, 26; Buffalo Branch, Mutual Film Corp. v. Breitinger, supra, 234; Leiper v. Baltimore & P. R. R. Co., 262 Pa. 328; Scranton v. Pub. Ser. Com., 268 Pa. 192; Springfield Water Co. v. Phila., 285 Pa. 172."

In *Ullom v. Boehm*, supra, an attack was made on the constitutionality of a statute which prohibited advertising of ophthalmic products. In an unanimous decision, this Court held that the statute was a valid exercise of police power and, therefore, did not violate Article I, §7, of the Pennsylvania Constitution by impairing the right of freedom of speech. In *Duquesne City v. Fincke*, supra, in denying the defendant's argument that a local ordinance requiring permission of the mayor to hold a meeting in the city streets violated Article I, §7, we stated at 118: "His contention founded thereon [on §7], however, overlooks the fact that they do not give to him the right to assemble with others and to speak wherever he and they chose to go . . . . The liberty of speech does not require that the clear legal rights of the whole community shall be violated." Also in *Duffy v. Cooke*, supra, a statute, prohibiting employees of any city of the first class from participating in any political activities, was held not to violate Article I, §7, of the Pennsylvania Constitution, and we relied on the reasoning and wording of *Atkin v. Kansas*, 191 U. S. 207, in interpreting Section

7. In *Mack Appeal,* supra, the appellants contended that a judicial rule prohibiting the taking of pictures near a courthouse violated Article I, §7. In denying their contentions, we relied on and quoted from the decisions of the United States Supreme Court interpreting the First Amendment of the United States Constitution, and on *Fitzgerald v. Philadelphia,* supra. The *Fitzgerald* case involved the constitutionality of the Loyalty Oath. In determining its constitutionality under Article I, §7, we relied on and adopted the interpretation of the United States Supreme Court of the First Amendment, at 387: "It was said in United Public Workers of America (C.I.O) v. Mitchell, 330 U. S. 75, 95: *'Of course, it is accepted constitutional doctrine that these fundamental human rights are not absolute . . .* The essential rights of the First Amendment in some instances are subject to the elemental need for order without which the guarantees of civil rights to others would be a mockery.' So, in American Communications Assn., C.I.O. v. Douds, 339 U. S. 382, 399, it was said: 'When particular conduct is regulated in the interest of public order, and the regulation results in an indirect, conditional, partial abridgement of *speech,* the duty of the courts is to determine which of these two conflicting interests demands the greater protection under the particular circumstances presented . . . On the other hand, legitimate attempts to protect the public . . . from present excesses of direct, active conduct, are not presumptively bad because they interfere with and, in some of its manifestations, restrain the exercise of First Amendment rights.' And in Thorp v. Board of Trustees of Schools for Industrial Education of Newark, 6 N. J. 498, 508, 509, 79 A. 2d 462, 467, it was said: 'But the fundamental civil liberties here involved are not absolute. The particular guarantee of freedom of thought and opinion by the First Amendment is not free of all qualification. Government has the inherent right of self-protection against the forces

that would accomplish its overthrow by violence. It is of the very nature of the social compact that the individual freedoms at issue here are subject to reasonable restraint in the service of an interest deemed essential to the life of the community . . . The question is whether the statutory proscriptions bear a reasonable relation to the apprehended public evil. Where a regulation in the interest of public order results in an indirect partial abridgment of civil rights, the inquiry is as to which of the two conflicting interests demands the greater protection in the circumstances. The incidental limitation of personal freedoms is justifiable where necessary in the service of an overriding public interest.' " (Emphasis supplied.) In *Wortex Mills v. Textile Workers U. of A.*, supra, we stated, at 363: "Picketing is a form of assembly and of speech and consequently comes within the First Amendment to the Constitution of the United States and within Article I, §7, of the Constitution of the Commonwealth of Pennsylvania, both of which guarantee freedom of speech: Thornhill v. Alabama, 310 U. S. 88; Carlson v. California, 310 U. S. 106; Westinghouse Electric Corp. v. United Electrical Workers, 353 Pa. 446, 46 A. 2d 16; Pennsylvania L. R. Board v. Bartenders Union, 361 Pa. 246, 64 A. 2d 834. But that does not mean that every kind of speech and every kind of picketing is lawful. *Freedom of speech is not absolute or unlimited*—for example, a man may not slander or libel another; he may not publicly blaspheme the Deity; he may not engage in loud mouth speaking through sound trucks during certain hours or in certain parts of a city; and he may not assemble with others to commit a breach of the peace or to incite to riot or to advocate the commission of crimes. Freedom of speech gives no right of intimidation or coercion and no right to damage or injure another's business or property, . . ." (Emphasis supplied.) Picketing, like motion pictures, is an exer-

cise of the right of free speech. Nevertheless, when either is detrimental to the public good, it may be suppressed and prevented from continuing: *Sansom House Ent. v. Local 301, AFL.*, 382 Pa. 476, cert. denied, 350 U. S. 896 (1955).

Furthermore, this Court in *Buffalo Branch, Mutual Film Corp. v. Breitinger*, 250 Pa. 225, 95 Atl. 433 (1915), rejected this same contention, that the Obscenity Act of June 19, 1911, P. L. 1067, violated the Constitution of Pennsylvania in requiring submission of the film to the State Board of Censors prior to the showing of a motion picture. We held that in the legislature's valid exercise of the state's police power to conserve and protect the morals and manners of the public, the individual rights of a person must give way. "The promotion of *public morals* and public health is a chief function of government, to be exercised at all times as occasion may require. The method by which the result may be accomplished depends upon the circumstances of the particular case, and the largest legislative discretion allowed: Beer Co. v. Massachusetts, 97 U. S. 25." (at 232, 233). We further said, at 234, " ' "The possession and enjoyment of *all* rights are subject to such reasonable conditions as may be deemed by the government authority of the country essential to the safety, health, peace, good order and *morals* of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is then liberty regulated by law . . ." ' " (Emphasis supplied).

Therefore, in the face of all this authority, how the Majority can state that there is an absolute prohibition against "prior restraint" under the Pennsylvania Constitution, is beyond my comprehension. As was stated by Mr. Justice BELL, speaking for an unanimous court,

in *Wortex Mills v. Textile Workers U. of A.*, supra, at 363, *"Freedom of speech is not absolute or unlimited . . . ."* either under the United States Constitution, or the Pennsylvania Constitution. (Emphasis supplied).

Nor does the statute offend Article I, §§6 and 9, of the Pennsylvania Constitution. The imperative therein that "trial by jury shall be as heretofore" is not infringed. The statute establishes a system of administrative control to the end that movies which are obscene may not be marketed for public consumption. This is not a statute involving a violation of the criminal laws. Determinations of a similar nature have been made by administrative agencies in Pennsylvania for years on end. See cases under the Milk Control Act and the Liquor Control Act. The majority decision, if carried through to its logical conclusion, will undermine the functioning of all administrative tribunals. Henceforth, every attempted enforcement of a civil penalty fixed by statute on a violation of an administrative order will require a jury trial, going to the merits of the administrative order which is, in effect, a collateral attack on a matter that is res judicata.

Furthermore, this precise question was passed upon by this Court and found to be without merit in *Buffalo Branch, Mutual Film Corp. v. Breitinger*, supra. In that case, the appellants attacked the Act of June 19, 1911, P. L. 1067, as a violation of Article I, §6, because it denied them a right of trial by jury. That Act, like the present one, provided for penalties upon the showing of a film in violation of an injunction issued pursuant to a finding by the State Board of Censors that the movie violated the standards of the statute. We rejected this contention, stating that this was not a common law offense, but a new one created by the legislature. " 'There is nothing to forbid the legislature

from creating a new offense and prescribing what mode they please of ascertaining the guilt of those who are charged with it. Many tribunals unknown to the framers of the Constitution, and not at all resembling a jury, have been erected and charged with the determination of grave and weighty matters; . . .' " (243) And, we further stated, at 249: "As to the additional claim made by the individual plaintiffs that they have been deprived of the right of trial by jury, no question of the right of trial by jury arises in the case. There is nothing in the Constitution which prohibits the legislature from declaring new offenses and defining the mode by which the guilt of persons accused thereof may be determined: Van Swartow v. Com., 24 Pa. 131." The same argument was rejected in *Commonwealth v. Blumenstein*, 396 Pa. 417, 153 A. 2d 227 (1959), which involved the Obscenity Act of June 24, 1939, P. L. 872, §528, 18 PS §4528, wherein we held at 419, that the prosecution "was brought under the statute and not under the common law. Hence the efficacy of the common law remedy against obscenity is not in issue." It was also, at least, impliedly rejected in *Times Film Corporation v. City of Chicago*, supra. See also, *Tahiti Bar, Inc. Liquor License Case*, 395 Pa. 335, 361 U. S. 85 (1959).

The statute further satisfies all constitutional requirements for a hearing. The demands of due process are met. Before the Board may disapprove any film for exhibition, it must first make certain findings. The word *find* is a word of art in the law. "To find" necessarily implies to ascertain and to declare an issue of fact through a judicial inquiry in a trial-type hearing. See *Hallgring v. Board of Com'rs of City of Newark*, 25 N. J. Super. 88, 95 A. 2d 498 (1953); Cf. *Aizen v. Pennsylvania P. U. C.*, 163 Pa. Superior Ct. 305, 60 A. 2d 443 (1948); *Stufflet v. Fraternal Order of Eagles*, 164 Pa. Superior Ct. 473, 65 A. 2d 443

(1949); *Kaylock Unemployment Compensation Case,* 165 Pa. Superior Ct. 376, 67 A. 2d 801 (1949). Every interested party will enjoy the opportunity of being heard, together with witnesses, who can give relevant testimony. If such due process is denied, the issue can be raised in timely and proper proceedings.

The Majority, in footnote 4, in reference to *Zenith Int't Film Corporation v. City of Chicago* (June 20, 1961), misinterprets the facts and holding of the case with reference to our present case. The Mayor of Chicago, who under the ordinance, was entrusted with the power of de novo review failed to view the film as a whole. Under this statute and the *Roth* case, and contrary to the *logic* of the Majority in arriving at the conclusion of its syllogism, the Board must and will view the film as a *whole.* Further, in the *Zenith* case, the censors and the Mayor failed to give a hearing to Zenith and an opportunity to show that the movie did not violate contemporary community standards, which our Board under a trial-type hearing will do. Also, the Chicago Board didn't state why the permit was refused. Our Board will give a detailed explanation in the event of a refusal. Furthermore, the make-up and the method of selection of the Chicago Board is completely different from that of the Pennsylvania Board. Therefore, there is no possible comparison between the *Zenith* case and our present statute with the exception of standards. The standards of Section 155-4 of the Municipal Code of the City of Chicago are as follows: "If a picture or series of pictures, for the showing or exhibition of which an application for a permit is made, is immoral or *obscene,* or portrays, depravity, criminality, or lack of virtue of a class of citizens of any race, color, creed, or religion and exposes them to contempt, derision, or obloquy, or tends to produce a breach of the peace or riots, or purports to represent any hanging, lynching, or burning of a human be-

ing, . . ." (Emphasis supplied.) That these standards are more far reaching in scope than those of the Act in question is plain. Our very narrow standards are "obscene" and "incite to crime", the latter applying only to children. But the important thing to bear in mind is that the 7th Circuit Court of Appeals did not question the standards in Section 155-4, and stated that, "The relief requested by plaintiff shall be granted unless the city provides a hearing consistent with the *standards* set out herein within a reasonable time after Zenith's resubmission of the film to proper city authorities. If the film is found *obscene* or otherwise objectionable after a proper procedural determination by the city authorities, plaintiff may then challenge before the district court *such finding* of *obscenity.*" (Emphasis supplied.) Furthermore the Supreme Court of Illinois, in *American Civil Liberties Union v. City of Chicago*, 3 Ill. 2d 334, 121 N.E. 2d 585 (1954), sustained some of the standards contained in the statute set out above, including "obscene." They didn't find, as the Majority found, the standards here in question, " 'so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech . . . as contrary to the Fourteenth Amendment.' "[3] We are also glad to note that the Majority, after rejecting the United States Constitution, is now adopting it again, but contrary to the interpretation of the United States Supreme Court.

Finally as well stated in the appellant's reply brief at pages 14, 15, 16: "The controlling principle here is that a statute and all of its provisions are to be construed in a manner consistent with the Constitutions

[3] See also *Times Film Corporation v. City of Chicago*, supra, footnote 4.

of the Commonwealth and of the United States. Statutory Construction Act of May 28, 1937, P. L. 1019, 46 Pa. Stat. Ann. §552(3) (Purdons).

"In interpreting Section 5 of the instant act, this Court should place upon it that construction which will save the statute rather than strike it down. The Courts consistently have construed statutes which are silent as to whether the administrative agency must hold a hearing as nevertheless requiring a hearing under the principles of due process. This problem has been met by 'reading into' the statute a requirement for a hearing. Wong Yang Sun v. McGrath, 339 U. S. 33 (1950). Although no express requirement for hearing in statute authorizing deportation, hearing requirements of §5 of the Administrative Procedure Act must be held to apply in order to bring the deportation statute in harmony with the requirement of procedural due process: Fahey v. Mallonee, 332 U. S. 245 (1947) ; Goldsmith v. Board of Tax Appeals, 270 U. S. 117 (1926) ; Jordan v. American Eagle Fire Insurance Co., 169 F. 2d 281 (D.C., 1948) ; Eisler v. Clark, 77 F. Supp. 610 (1948) ; Martin v. Board of Supervisors, 135 Cal. App. 96, 26 P. 2d 843 (1933) ; Reed v. Collins, 5 Cal. App. 494, 90 P. 73 (1907) ; American Civil Liberties Union v. City of Chicago, 3 Ill. 2d 334, 350, 121 N.E. 2d 585 (1954) ; State of Minn. ex rel. Powell v. State Medical Examining Board, 32 Minn. 324, 20 N.W. 238 (1884) ; L. A. Darling Co. v. Water Resources Commission, 341 Mich. 654, 67 N.W. 2d 890, 896 (1955) ; Gage v. Censors of the New Hampshire Eclectic Medical Society, 63 N. H. 92 (1884), and Perpente v. Moss, 293 N. Y. 325, 56 N.E. 2d 726 (1944). See also Pennsylvania R. Co. v. New Jersey State Aviation Commission et al., 65 A. 2d 61 (1949) ; Garden Court Apartments, Inc. v. Hartnett, 65 A. 2d 231, 234 (1949).

"This was precisely the practice followed by this Court in Commonwealth ex rel. Dermendzin v. Myers,

397 Pa. 607 (1959). Therein, a defendant sentenced to an enlarged term of imprisonment under the Habitual Criminal Act of 1939, was not informed that he had a right to hearing on the issue of recidivism, contrary to the requirements of procedural due process. The act does not in terms provide for either notice or hearing before sentence is imposed on a second offender as it does in the case of a fourth offender. Nevertheless, this Court, speaking through Chief Justice JONES read the act as impliedly providing for the requisite hearing in order to save it from constitutional defect:

" 'While the Act does not expressly provide for similar procedure before the sentencing of a second or third-time offender, we are constrained, in order not to involve a constitutional question of want of due process, to construe the Habitual Criminal Act as impliedly intended to require adequate notice and hearing on the issue of recidivism before an enlarged term of imprisonment can be imposed on a second offender. Under well established rules of construction, it is our duty to interpret a statute so as to render it constitutional if it is at all reasonable so to do . . .', 397 Pa., supra at 614."

In conclusion, it is my belief that the majority opinion herein misreads the words of the statute involved and what is intended thereby to help justify its argument that it is unconstitutional. Instead of construing the statute in a manner that would save and render it effective, misinterpretations are utilized in order to strike it down.

For these reasons, I emphatically dissent.

Mr. Justice BELL joins in this dissent.