Gaskins Case.

Argued November 23, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

300

reargument refused August 30, 1968.

*James D. Crawford,* Assistant District Attorney, with him *Alan J. Davis,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellant.

*Bernard L. Segal,* with him *Mary Bell Hammerman,* and *Needleman, Needleman, Segal & Tabb,* for appellee.

*William T. Coleman, Jr.,* with him *Robert W. Maris,* and *Dilworth, Paxson, Kalish, Kohn & Levy,* for County Court of Philadelphia, amicus curiae.

OPINION BY MR. CHIEF JUSTICE BELL, April 24, 1968:

The defendant, Dwight Gaskins, 14 years of age, lived permanently with his grandmother. Douglas Minnay, aged 15, had been invited by Gaskins to live temporarily with him in his grandmother's home. During the evening of May 18, 1966, an argument concerning a watch developed between the two boys. According to the testimony of witnesses, Minnay had been pushing Gaskins in front of his grandmother's home. Gaskins then went inside, picked up a knife which he placed in his pocket, and told his grandmother that

Minnay was bothering him. Gaskins's grandmother came outside and told Minnay to leave Dwight alone. While Dwight was standing on the porch, after his grandmother had gone inside her house, Minnay ran up the steps and pushed him. Gaskins then jumped down the steps, took the knife from his pocket, and fatally stabbed Minnay in the chest.

Later that same evening, Gaskins was arrested and charged with homicide by stabbing. The next morning, he appeared before Judge Charles WRIGHT in the Juvenile Court Division of the County Court for a hearing on a petition alleging that he was a "delinquent" child. The petition, signed by one of the investigating officers, averred: "That the said Dwight Gaskins was brought to the Youth Study Center . . . charged with Homicide, by Stabbing. Deceased: Douglas Minnay. . . ." The proceedings were continued, in order to enable Gaskins to obtain counsel, and the Assistant District Attorney, when asked whether the Commonwealth would request certification of the case, answered, "I have not discussed it with anyone. I would feel maybe no."

On May 27, 1966, a further hearing was held, at which time a different Assistant District Attorney appeared and requested that Judge WRIGHT sit as a committing magistrate for the purpose of certifying the case for prosecution as a criminal matter. Gaskins's attorney also requested certification and, upon the refusal of Judge WRIGHT to certify the case, Gaskins's attorney took an exception to this ruling. After hearing testimony from an investigating officer and from several eyewitnesses, the case was continued until June 9, 1966, at which time further testimony was to be taken.

When proceedings were resumed on June 9, 1966, a third representative of the District Attorney's office appeared and reiterated the request that the case be

**302**

certified for prosecution as a criminal case.* This request and motion was denied.

Two witnesses were then presented on behalf of Dwight Gaskins, and the boy himself also testified with respect to several aspects of the Minnay killing. After hearing the testimony, Judge WRIGHT adjudicated Dwight Gaskins a delinquent, committing him to Glen Mills School until he reached 16 years of age, and then to the State Correctional Institution at Camp

---

\* The District Attorney's representative repeatedly insisted that Judge WRIGHT certify the case for trial in Quarter Sessions Court, as a result of which he was ejected from the courtroom by Judge WRIGHT: "MR. OSTROW: For the record, I have been instructed to make a request. The request is that we have this matter certified. THE COURT: Look, just a minute. When the request was made, I think I ruled upon it last time. Now, it is ruled on. Let's go on with the case. I have ruled on it, I don't want to hear anymore. MR. OSTROW: If your Honor please—THE COURT: I don't want to hear anything more about it. MR. OSTROW: If your Honor please—THE COURT: I don't care what you have been instructed, this request has been made. I have ruled on it and I am not going to hear anymore about the case. MR. OSTROW: Your Honor, I have been told—THE COURT: I don't care what you have been told. Now, keep quiet in regard to that. MR. OSTROW: Your Honor is not—THE COURT: Eject him from this court room. I don't want to hear this nonsense. Now, I have made my decision on this case. Now, let's proceed with the case. (District Attorney ejected.) THE COURT: Go ahead."

Assuming *arguendo* that Judge WRIGHT may have been justified in ejecting the District Attorney's representative in order to control the orderliness of the proceedings before him, he certainly was *not* justified in proceeding with the case. At the least, he should have postponed the hearing until the District Attorney could send another representative.

In order that the interests of the State can be adequately protected, we hold that the Commonwealth has an *absolute* right to have a representative present in every Juvenile Court proceeding involving a juvenile offender. Since the Commonwealth appeals only from the failure of Judge WRIGHT to certify the case for trial in a criminal Court, no issue is presented in this appeal with respect to this unwarranted action of Judge WRIGHT.

Hill until he becomes 21. Thereafter, the Commonwealth filed this appeal from the refusal of Judge WRIGHT to certify the case for prosecution in the criminal courts. A motion to quash the Commonwealth's appeal was filed by the attorney for Gaskins. A brief was filed by the County Court of Philadelphia as amicus curiae, urging the affirmance of Judge WRIGHT's Order.

## Motion To Quash Appeal

In his motion to quash the appeal, Dwight Gaskins raises two principal arguments: (1) that the Commonwealth may not appeal from the action and order of a County Court Judge in a criminal case when he is sitting in the Juvenile division, and (2) that, assuming such an appeal would be proper, the Superior Court, rather than the Supreme Court, is the Court of proper jurisdiction. We disagree with both of these contentions.

We shall first consider whether the Supreme Court or the Superior Court had jurisdiction over the Commonwealth's appeal from Judge WRIGHT's refusal to sit as a committing magistrate and hold Gaskins for the grand jury and certify the case to the Court of Oyer and Terminer for trial. The basis of the Commonwealth's appeal to this Court is that it had produced sufficient evidence before Judge WRIGHT, sitting either as a County Court Judge or as a committing magistrate,* to establish a prima facie case of murder, and therefore Judge WRIGHT had both the power and the duty to hold Gaskins for the grand jury.

---

* The Act of July 12, 1913, P. L. 711, §11(f), as amended, 17 P.S. §694(f), provides: "The judges of the said [County Court] shall be ex officio justices of the peace."

This Court has jurisdiction over this appeal. The Act of June 24, 1895, P. L. 212, §7.4, as amended by the Act of August 14, 1963, P. L. 819, 17 P.S. §191.4, pertinently provides in Section 7.4: "In the following *classes of cases,* the Superior Court shall have *no* jurisdiction thereof, but the appeal from the judgment, order or decree of the lower court shall be taken directly to the Supreme Court: (1) *Felonious homicide;* [emphasis supplied]. . . ."

When subsection 2(1) of this amendatory Act of August 14, 1963 is contrasted with other subsections of the same Act, it is clear that subsection 2(1) was intended to deal with the order of *any* Court below, or magistrate or justice of the peace, involving felonious homicide. If the Legislature had intended to limit and restrict the coverage of subsection 2(1) to appeals from orders of specified lower Courts, it would have specifically or clearly said so. In contrast to subsection 2(1), supra, subsection 2(3) is limited by its language to petitions, orders and decrees of the "Orphans'. Court," and subsection 2(7) is limited by its language to appeals from orders of the "Courts of Common Pleas and Courts of Quarter Sessions of the Peace."

Thus, since this appeal involves the question or issue of a felonious homicide, this Court has jurisdiction over the Commonwealth's appeal.* This is so even

---

* The Act of March 2, 1923, P. L. 3, No. 1, §1, 17 P.S. §187, does provide that "appeals from any order, judgment, or sentence of the [County Court of Philadelphia] not provided by law to be taken to the Court of Common Pleas or Court of Quarter Sessions of the Peace of the particular county, shall be taken to and heard by the Superior Court and shall not be appealable to the Supreme Court, except upon allowance as in the case of other orders, judgments, and sentences of the Superior Court." However, this section does not preclude the Supreme Court from exercising jurisdiction over this appeal because: (1) the Commonwealth is appealing not only from the judgment, order or sentence of Judge WRIGHT sitting as a Judge of the County Court, but also from Judge WRIGHT's

though the issue arose in a delinquency hearing in the Juvenile Court, from which appeals are ordinarily taken to the Superior Court.

Although, as a general rule, the Commonwealth is not entitled to appeal in criminal cases, this Court has repeatedly ruled that the Commonwealth may appeal from adverse rulings on pure questions of law. *Commonwealth v. Jefferson*, 423 Pa. 541, 226 A. 2d 765; *Commonwealth v. Tabb*, 417 Pa. 13, 207 A. 2d 884; *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A. 2d 304; *Commonwealth v. Melton*, 406 Pa. 343, 178 A. 2d 728; *Commonwealth v. Melton*, 402 Pa. 628, 168 A. 2d 328; *Commonwealth v. Hartman*, 383 Pa. 461, 119 A. 2d 211; *Commonwealth v. Simpson*, 310 Pa. 380, 165 Atl. 498.

Furthermore, this Court has recently held that the Commonwealth may appeal from pre-trial rulings on matters of law where the practical effect of such a ruling is to terminate the prosecution. *Commonwealth v. Bosurgi*, 411 Pa., supra. In this case, we are dealing with a pure question of law, and hence we agree with the Commonwealth that it is entitled to appeal in this case.

Gaskins also challenges the validity of this appeal on the ground that the Commonwealth should have sought a writ of prohibition to prevent the Juvenile Court from making an adjudication on a petition for delinquency. This challenge is based on Gaskins's con-

refusal as a committing magistrate to hold Gaskins for the grand jury on the charge of murder, and (2) the 1963 amendments to the Act of June 24, 1895, supra, in fixing the appellate jurisdiction of the Superior Court, specifically excluded "cases involving the right to a public office, *and in case of felonious homicide,** in which cases the remedy by appeal to the Supreme Court shall not be affected by this act." To the extent that the Act of March 2, 1923, supra, is inconsistent with the Act of 1963, it is repealed by §4 of the 1963 amendatory statute.

* Italics throughout, ours.

tention that the Commonwealth, by permitting the Juvenile Court proceedings to continue—which parenthetically it did not agree to—, has "permanently and irretrievably" prejudiced Gaskins's position, because he was led into giving clearly self-incriminatory testimony before Judge WRIGHT. For this reason, Gaskins then concludes that the case cannot now be certified to the grand jury for possible trial in Criminal Court. There is no merit in this contention.

In the event that the Commonwealth is successful in bringing Gaskins to trial for murder, Gaskins's rights are specifically protected by §19 of the Juvenile Court Act of 1933, P. L. 1433, 11 P.S. §261, which specifically provides that the evidence given by Gaskins and other witnesses at the Juvenile Court hearings will not be admissible in any future criminal trial in the Court of Oyer and Terminer or Quarter Sessions Court.

In *Com. ex rel. Hendrickson v. Myers*, 393 Pa. 224, 144 A. 2d 367, the Court said (page 227): "Generally speaking, there are several cogent reasons why juvenile records and evidence given in juvenile proceedings should not be used as evidence against a child in any case or proceeding in any other court. Juvenile Court proceedings are normally informal, and many of the important constitutional and statutory guarantees afforded a defendant in a criminal trial do not apply to a juvenile in a hearing before a Juvenile Court. Holmes' Appeal, 379 Pa. 599, 109 A. 2d 523. For these reasons, it would be unjust and illegal to allow the introduction of juvenile records or evidence given in juvenile cases to be later introduced as competent evidence in criminal cases or proceedings in any other court, in the same manner as criminal convictions or evidence taken in criminal proceedings may in certain instances be competent evidence in other criminal proceedings."

In *Commonwealth v. Johnson*, 402 Pa. 479, 167 A. 2d 511, the Court said (page 481): ". . . The juvenile court record was inadmissible under Holmes' Appeal, 379 Pa. 599 (1954), 109 A. 2d 523, where we pointed out that the Juvenile Court is not a criminal court; under Commonwealth ex rel. Hendrickson v. Myers, 393 Pa. 224 (1958), 144 A. 2d 367, where we referred to the informality and difference in procedure of the Juvenile Court; and also under the Act of June 2, 1933, P. L. 1433, §19, 11 P.S. §261. The Act reads: 'No order made by any Juvenile Court shall operate to impose any of the civil disabilities ordinarily imposed by the criminal laws of the Commonwealth, nor shall any child be deemed to be a criminal by reason of any such order or be deemed to have been convicted of crime. The disposition of a child or *any evidence given in a Juvenile Court shall not be admissible as evidence against the child in any case or proceedings in any other Court.*'"

### Certification for Trial in Criminal Court

The Commonwealth contends that Judge WRIGHT abused his duty and his discretion in failing to hold Dwight Gaskins for the grand jury on the charge of murder. The Commonwealth states that in Philadelphia it is customary to hold preliminary hearings in cases where a juvenile is accused of murder before Judges of the Juvenile Court. The Commonwealth contends that the purpose of this procedure is to assure a juvenile that he will enjoy the protection afforded by the Juvenile Court until the Commonwealth has presented a prima facie case of murder. Having established a prima facie case of murder against Gaskins, the Commonwealth argues that Judge WRIGHT had no alternative but to certify the case for trial in the criminal courts.

Gaskins, on the other hand, contends that the proceedings before Judge WRIGHT were strictly juvenile proceedings on the delinquency petition, and did not amount to a preliminary hearing on the charge of homicide. We cannot agree with this conclusion. Judge WRIGHT stated at the beginning of the May 27th hearing that he would decide on certification "after hearing the testimony." It would be unreasonable for Judge WRIGHT to listen to the testimony as to delinquency and, if the testimony disclosed a prima facie case of murder, then to re-hear the entire testimony as a committing magistrate. Indeed, the record discloses that Judge WRIGHT considered that he was sitting both as a magistrate and as a Juvenile Court Judge when he made the following statement during the course of the May 27th hearing: "Now, before cross-examining, there is a complete summary of the statement given to you by this young man, Dwight Gaskins; is that correct or is there something else in the statement which you feel would be of interest to this Court sitting *either as a Magistrate* or a Juvenile Judge that relates to this incident?" This statement, coupled with customary local practice, clearly shows that Judge WRIGHT was sitting, inter alia, as a committing magistrate.

Rule 119(a) of the Pennsylvania Rules of Criminal Procedure provides: "The attorney for the Commonwealth may appear at a preliminary hearing and: (1) Assume charge of the prosecution; and (2) Recommend to the issuing authority that the defendant be discharged or bound over to court according to law."

Rule 122(a) of the Pennsylvania Rules of Criminal Procedure deals with disposition of matters at a preliminary hearing, and states: "If the Commonwealth establishes a prima facie case of the defendant's guilt, the issuing authority shall hold him for court. Other-

wise, the defendant shall be discharged. In either case, the decision of the issuing authority shall be publicly pronounced."

Judge WRIGHT in his Opinion states that the reason he did not certify this case is because he did not feel that the killing of Minnay rose to the degree of murder. Judge WRIGHT determined that he was not going to certify the case during the testimony of the Commonwealth's first witness, Detective James McGowan, at the hearing on May 27th. Had Judge WRIGHT withheld making his decision until the conclusion of the Commonwealth's case, he would then have known that a jury could have found that the Commonwealth had made out a prima facie case of murder against Gaskins. *Commonwealth v. Pavillard*, 421 Pa. 571, 220 A. 2d 807.

Both Gaskins and the amicus County Court contend that it is irrelevant that a prima facie case of murder had been made out, because once jurisdiction attached to the Juvenile Court by virtue of the delinquency proceeding, it had the sole right to proceed with the disposition of the case. We have reviewed all of the statutes on which they rely, namely, the Act of July 12, 1913, P. L. 711, §11, as amended, 17 P.S. §694, and the Juvenile Court Act and the Municipal (now County) Court Act.

It will suffice to say—without quoting the provisions of these Acts—(1) that the Juvenile Court has jurisdiction to determine delinquency no matter what crime serves as the basis of the delinquency petition; (2) that jurisdiction of the Juvenile Court can be invoked by two methods: (a) on petition of delinquency, or (b) by commitment by a magistrate where the child has been arrested on any indictable offense other than murder; but (3) that the invoking of Juvenile Court jurisdiction by either method does not oust a criminal

prosecution where the juvenile is charged with murder. To hold otherwise would in effect transfer the responsibility for and the power of disposing of murder cases from the Courts of Oyer and Terminer, which are Constitutional Courts that have been given exclusive jurisdiction in murder cases, to the Juvenile division of the County Court, which was created by the Legislature, and in the creation of which the Legislature specifically limited its jurisdiction *to exclude "jurisdiction in the trial of indictments for murder, voluntary manslaughter. . . ."* Act of July 12, 1913, supra.

We, therefore, hold that when a juvenile has been charged with murder, and a prima facie case has been made out by the Commonwealth in Juvenile Court proceedings, such juvenile must be held for further criminal proceedings. If a Court of proper jurisdiction should thereafter determine that it is in the best interests of both the child and Society that the criminal prosecution should not be pursued, that Court shall thereafter have the right to transfer jurisdiction to the Juvenile Court. See *Mont Appeal,* 175 Pa. Superior Ct. 150, 103 A. 2d 460.

The Order of the County Court is hereby vacated and the matter remanded to the County Court, with directions to hold Dwight Gaskins for the grand jury on the charge of murder.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

Our Chief Justice has permitted, and the majority of our Court has apparently approved, the establishment of a precedent which permits a lower court from which an appeal has been taken to engage counsel to represent the lower court in the appeal so that the lower tribunal's determination may be sustained.

Counsel for the County Court seeks to justify his appearance before our Court by the following quote

taken from his brief: ". . . The County Court, because of its statutory duty to act as *parens patriae* towards the children and adolescents who come before its Juvenile Division, is vitally concerned that its proper statutory powers be fully and correctly exercised. Therefore it is presenting this brief *amicus curiae,* by its counsel, to point out to the Court the relevant statutory provisions which governed the disposition by Judge WRIGHT of the case of Dwight Gaskins below and to demonstrate that these provisions fully support his actions."

Such action is contrary to our established concepts of the rights and duties of a lower tribunal and runs counter to all past appellate court procedures. On the merits, I am inclined to agree with the action of the lower court.

I dissent.