Commonwealth *v.* Dillworth, Appellant.

Argued November 16, 1965; reargued May 3, 1966, and November 29, 1967. Before BELL, C. J., MUSMAN-NO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*R. Alan Stotsenburg,* with him *William D. Miller, Frank M. Jakobowski* and *John A. Luchsinger,* for appellant, Dillworth.

*R. Alan Stotsenburg,* with him *Robert N. C. Nix, Jr.,* and *Nix, Rhodes & Nix,* for appellant, Murphy.

*Gordon Gelfond,* Assistant District Attorney, with him *Joseph M. Smith,* Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

*David Berger,* for County Court of Philadelphia, intervenor.

*John H. Lewis, Jr.,* for Legal Aid Society of Philadelphia, intervenor.

OPINION BY MR. JUSTICE O'BRIEN, October 3, 1968:

These two actions now before this Court arose under the Civil Procedural Support Law, Act of July 13, 1953, P. L. 431, as amended, August 14, 1963, P. L. 872, 62 P.S. Sec. 2043.31 et seq., originating in the Women's Division of the County Court of Philadelphia on complaints filed by the respective mothers of two children born out of lawful wedlock. Our Court, by order dated August 3, 1965, consolidated them for argument as both cases present an identical question.

In Dillworth's case, the complaint was filed on November 26, 1963; in Murphy's case, on November 21, 1963. In the Murphy case, plaintiff swore out a criminal information against Murphy charging him with the crimes of fornication and bastardy resulting in the subsequent birth of a child. In the Dillworth case, plaintiff's petition did not indicate under what act of the assembly the petitioner was proceeding. Prior to the time of trial however, both complaints were in the form as set forth in the Civil Procedural Support Law, as amended. (62 P.S. Sec. 2043.31 et seq.)[1] Dillworth's

---

[1] The 1963 amendment modified the definition of duty to support to include a child born out of lawful wedlock. The act now provides "Duty to Support. '. . . Includes any duty of support imposed or imposable by law or by any court order, decree or judgment, whether interlocutory or final, whether incidental to a pro-

case was heard on February 3, 1964, at which time Dillworth appeared with counsel who demanded a jury trial. This was denied and the trial proceeded with the court making a finding of paternity and ordering weekly support payments of $10.00. In the Murphy case, the original complaint as filed charged the defendant with fornication and bastardy under Section 506 of The Penal Code (18 P.S. §4506). However, following the effective date of the amendment to the Civil Procedural Support Law of August 14, 1963, the charge of fornication was dropped from the complaint and the case came to trial on February 3, 1964. The defendant was represented by counsel who by motion requested a jury trial. The motion was dismissed and the court, after making a finding of paternity, ordered the defendant to pay $7.00 a week until the child reached the age of eighteen.

Dillworth took an appeal to the Superior Court (October Term, 1964, No. 270), where the Order of the County Court of Philadelphia was affirmed. (204 Pa. Superior Ct. 420). We subsequently granted allocatur. In the Murphy case the appellant also appealed the order of the lower court to the Superior Court where, because it presented an identical question as had been presented in the Dillworth case, the Superior Court certified Murphy's appeal to this Court. On petition of both appellants, in which the Commonwealth joined, we consolidated both appeals. As these appeals question the validity of a statute, we also gave leave to the Attorney General of the Commonwealth to intervene; however, he has not seen fit to do so.

The same two questions are before us as were considered by the Superior Court in the Dillworth case

---

ceeding for divorce, legal separation, separate maintenance, prosecution for failure to support a child born out of lawful wedlock, or otherwise.' "

(204 Pa. Superior Ct. 420), namely, (1) whether the legislature intended to authorize a determination of paternity of an illegitimate child by a judge alone and, if so, (2) whether such an authorization by the legislature violated the right of jury trial guaranteed by Section 6 and/or Section 9 of Article I of the Constitution of Pennsylvania.

Mindful of the judicial practice of not reaching constitutional issues if the case may properly be disposed of on other grounds, we find it unnecessary to resolve the second question. We are of the opinion that the legislature never intended to authorize a determination of paternity by a judge alone.

The Civil Procedural Support Law as originally enacted[2] did not provide for the support of illegitimate children. In 1963, however, the statute was amended to include an action for support of illegitimate children.[3] Prior to the adoption of this amendment, an order for support of an illegitimate child could only be entered after a determination of paternity had been established by criminal proceedings under The Penal Code of June 24, 1939. This determination could be made either in a prosecution for fornication and bastardy under §506 of the Code, 18 P.S. §4506, or in a prosecution for willful neglect to support a child born out of lawful wedlock under §732 of the Code, 18 P.S. §4732. The trial judge relied on the 1963 amendment to the Civil Procedural Support Act as enabling her to

---

[2] Act of July 13, 1953, P. L. 431, §2, 62 P.S. §§2043.31-2043.44.

[3] Act of August 14, 1963, P. L. 872, 62 P.S. §§2043.32, 2043.35. To the definition of "Duty to Support" was added "prosecution for failure to support a child born out of lawful wedlock," so that the definition now reads as set forth in footnote 1. Likewise, §5 of the original act (62 P.S. §2043.35), setting forth the procedure for filing a complaint, was amended by adding to subparagraph (3) the following: "if married, or if unmarried, the date and place of birth of each child born out of lawful wedlock."

make a finding of paternity without prior criminal proceedings as theretofore had been required.

Appellants contend, however, that the enactment of this 1963 amendment to the Civil Procedural Support Law was not intended by the legislature to discard the right to a jury trial in the determination of paternity, but, rather the act becomes operative only after a finding of paternity by prior criminal proceedings under The Penal Code.

The Superior Court, rejecting appellants' contention, held that unless the 1963 amendment to the Civil Procedure Support Law was interpreted as authorizing a finding of paternity without a prior criminal proceeding it is "totally without effect and leaves the situation exactly as it was before."[4] The court based its conclusion on the fact that under the existing sections of The Penal Code, §506 and §732, the trial court had authority to make a support order in favor of an illegitimate child and to increase or decrease that order whenever such action was justified. Accordingly, the Superior Court construed the amendment as manifesting a legislative intent to abrogate the putative father's right to have a jury decide the issue of paternity.

We cannot agree that appellants' view leaves the 1963 amendment totally without effect. The amendment serves a very worthwhile purpose if it is interpreted as creating a judicial short cut permitting the entry of a support order in the case of "a child born out of lawful wedlock" without a prior criminal proceeding when paternity is not disputed.[5] Thus, if the putative father is willing to support his child but

---

[4] *Com. ex rel. Miller v. Dillworth*, 204 Pa. Superior Ct. 420, 423, 205 A. 2d 111, 113 (1964).

[5] In 1965, 83% of the 2,034 defendants in Philadelphia admitted paternity. Fifty-second Ann. Rep. of the County Ct. of Phila., 292 (1965).

simply disputes the amount he is required to pay, the order can be entered without compelling him to suffer the stigma of pleading guilty to a criminal offense.

Surely the above interpretation of the legislative intent is the most consistent with prior treatment of the right to a jury trial. "The right to trial by jury has sometimes been figuratively referred to as 'the jewel of Anglo-Saxon jurisprudence.'" *Com. v. Fugmann*, 330 Pa. 4, 29, 198 Atl. 99, 111 (1938); accord, *William Goldman Theatres, Inc. v. Dana*, 405 Pa. 83, 93, 173 A. 2d 59, 64, cert. denied, 368 U.S. 897, 82 S. Ct. 174 (1961). The Superior Court stressed §3 of the Civil Procedural Support Act which provides that "the proceedings provided by this act are in addition to and not in substitution of proceedings provided by law where there is desertion or failure to support." Emphasizing the "in addition to" phrase but ignoring the "not in substitution of" phrase, the Superior Court held that criminal proceedings were not required as the basis for a support order where paternity was disputed. Yet under this construction, the decision to dispense with a jury trial is given exclusively to the prosecutrix, or more realistically, the Commonwealth; clearly this is not in accord with the usual practice, in both civil and criminal cases, where the consent of both parties is a prerequisite for dispensing with a jury trial.[6] The right to jury trial has been deemed so important that in *Com. v. Hall*, 291 Pa. 341, 140 Atl. 626 (1928), this Court, speaking through Chief Justice VON MOSCHZISKER, held that absent specific legislative authorization, when a defendant plead not guilty, the Court of Quarter Sessions had no power to try the

[6] See, regarding civil cases: Art. 5, Sec. 27 of the Pennsylvania Constitution; Act of April 22, 1874, P. L. 109, §§1, 4, 12 P.S. §§688, 691, regarding criminal cases: Act of June 11, 1935, P. L. 319, §§1-2, as amended, 19 P.S. §§786-87.

case without a jury even if the defendant waived his right to a jury trial. In neither the original Civil Procedural Support Law, enacted in 1953, nor in the 1963 amendment to that law involved in the present litigation did the Legislature refer to the manner in which the relevant facts were to be determined. As we said in *Com. v. Turchetta*, 404 Pa. 41, 47, 171 A. 2d 54, 57 (1961) : "We should not be ingenious to find reasons to deny a man his trial by jury when he presses for it at trial: . . .". Statutes which tend to infringe on the right to trial by jury ought to be strictly construed. *Gordon v. Biesinger*, 335 Pa. 1, 6 A. 2d 425 (1939) ; *Felt v. Cook*, 95 Pa. 247 (1880) ; *Rhines v. Clark*, 51 Pa. 96 (1866).

We are unable to infer an intention to dispense with a jury determination of paternity from the language of the 1963 amendment.

The orders of the Superior Court and the County Court of Philadelphia are reversed, and the cases are remanded for proceedings consistent with this opinion.

Mr. Justice JONES dissents.

---

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I concur in the result, but I am compelled to make additional comments.

I strongly disagree with Justice COHEN'S conclusion that a lower Court should *never* be permitted to have its practices and procedures supported by a counsel of its own choosing.

The questions and issues raised in this case were exceptional. They involved not only thousands of mothers, putative fathers and helpless dependent babies and little children, but likewise the powers and the practices and procedures which the County Court of Philadelphia had established and long followed. If these practices were held to be invalid or unconstitu-

tional, the result would seriously impede the prompt disposition by the Court of the multitude of cases of this nature which are brought before it. To invalidate the long-established practices and procedures in this field would tremendously increase the backlog of cases in that Court and postpone for many months, if not for many years, the necessary financial support by fathers of babies and little children. Under these exceptional circumstances, it was certainly wise to permit the County Court to intervene and to present its views by David Berger, an attorney of its choice. Mr. Berger, a former Chancellor of the Philadelphia Bar Association, a former City Solicitor, and a prominent member of the Bar, alleged in his petition that the case ". . . affects in the highest degree the procedures of the County Court, the substantial backlog of cases, and the support of a large number of illegitimate children.

"In addition, this case presents issues of paramount importance to the general public, to the Commonwealth as a whole, and to the courts in which the Civil Procedural Support Law and support matters generally are enforced."

Mr. Berger also alleged in his petition that the decision of the Supreme Court ". . . will have a serious effect on the current, great backlog of support cases as yet unheard. Further, your Petitioner believes that should the procedure which it [the Court] has followed in this case and in all such cases since the effective date of the amendatory Act be overturned, a new and even greater backlog of such cases will be created which will substantially delay justice to the point that in many instances, justice may be denied entirely to the unfortunate illegitimate children and their mothers for whose benefit the Legislature enacted the Support Law."

Under such circumstances, it was eminently proper that the petition of the County Court to be represented by an attorney of its choice should be granted.*

CONCURRING OPINION BY MR. JUSTICE COHEN:

More than three years ago on April 19, 1965, we allowed appeals from the Superior Court's determination in the above matters. The appeals were argued November 16, 1965; reargued May 3, 1966 and reargued for the second time November 29, 1967.

Contributing to this long delay was the action taken by our Court on November 19, 1965, permitting the lower court (from which the appeals had been taken) to engage counsel to represent the lower court in the appeals to our Court, advocating that the lower court's determination be sustained. (See *Gaskins Case,* 430 Pa. 298, 244 A. 2d 662 (1968)). I cannot refrain from commenting upon the impropriety of such practice. I see no place in our judicial system for the intrusion of lower tribunals in proceedings of our Court. They tend only to confuse and disrupt, but more important their presence indicates overtones of objectives not compatible with justice. This unusual display of personal interest by a lower court demonstrates that the court was incompetent to have heard the litigation in the first instance.

I do not mean to imply any criticism of counsel, since I recognize the difficult position in which counsel is placed when requested by the lower court to represent it in appellate litigation. I do, however, severely criticize both the county court that activated

* We note that in *In re Gault,* 387 U.S. 1, the Supreme Court of the United States permitted an Attorney General to present *and argue* the *appeal* before that Court as amicus curiae, on behalf of the Ohio Association of Juvenile Court Judges.

the intervention, and our Court which permitted and acquiesced in such an unusual procedure.[1]

While I concur and join in the opinion of Justice O'BRIEN, I cannot fail to observe that any other determination on the part of our Court would have required an analysis and decision concerning the applicability of Article I, Sections 6 and 9 of the Constitution of Pennsylvania, which provisions guarantee a defendant a trial by jury "as heretofore" provided. I am convinced there has never been a case in this Commonwealth, either before or after the adoption of our Constitution, where we have imposed an obligation to support a child born out of wedlock without affording the defendant a trial by jury if requested. To hold otherwise would in my view clearly violate those guarantees in our Constitution which are to remain inviolate.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I agree with the analysis employed in the majority opinion. Given the fact that prior to the 1963 amendment all support orders for out of wedlock children were entered pursuant to criminal convictions,[1]

---

[1] The citation in the footnote of the concurring opinion of the Chief Justice demonstrates the author's failure to recognize the problem. In *Gault* the Ohio Association of Juvenile Court Judges as amicus curiae urged affirmance before the U. S. Supreme Court. This intervention was allowed to the *Association* and not, as the Chief Justice seems to imply, to the very court from which the appeal was taken.

[1] The Commonwealth concedes this point in its brief at 5-6: "There is no doubt that prior to the 1963 amendment to the Civil Procedural Support Law . . . actions seeking to obtain an order for support of an illegitimate child had to be brought by criminal prosecution, either under Section 506, of the Penal Code . . . (fornication and bastardy), or under Section 732 of the Penal Code . . . (wilful neglect or refusal to support a child born out of lawful wedlock). And, in proceedings under either section, since fornica-

that the 1953 act is silent on the issue of whether a jury trial is required and that our cases demonstrate that a jury trial is a right not lightly dispensed with, the conclusion is required that a putative father may demand a jury trial.

However, I wish it clearly understood that in my view the majority opinion, one which rests *solely* on the conclusion that the 1963 amendment does not evidence a legislative intent to abolish jury trials in out of wedlock cases, does not constitutionally foreclose legislative action which evidences such an intent. Without expressing any view on the constitutionality of a legislative decision to abolish jury trials in cases of this type, I do not think it inappropriate to note that a variety of techniques would be available. (1) The Legislature could amend the 1953 act in such a manner that it becomes clear that jury trials are not available in out of wedlock cases. (2) The New Jersey system could be adopted in which under N.J.S.A. 9:16-1 et seq. the mother may institute a summary proceeding before a magistrate against the alleged father or under N.J.S.A. 9:17-1 et seq. the director of welfare of the appropriate county may institute a similar proceeding. See *Tuohy v. Boynton,* 5 N.J. Super. 265, 68 A. 2d 851 (1949) ; *Kopack v. Polzer,* 5 N.J. Super. 114, 68 A. 2d 484 (1949). Any of the three possible parties—the mother, the alleged father or the welfare agency—may, under N.J.S.A. 9:17-20, appeal the determination below and demand a jury trial. See *M v. F,* 55 N.J. Super. 548, 151 A. 2d 222 (1959).[2] Nor do

tion and neglect or refusal to support a child born out of lawful wedlock are designated to be misdemeanors, a defendant, disputing paternity, was entitled to a jury trial, unless that right be waived."

[2] A variant of the New Jersey procedure is apparently presently utilized in the County Court of Allegheny County. See *Commonwealth v. Pewatts,* 200 Pa. Superior Ct. 22, 186 A. 2d 408

I regard this list exhaustive. Simply, the majority opinion does not hold that the Legislature is powerless to promulgate measures which will make the utilization of the jury system more attuned to modern conditions.

As emphasized by the majority, the 1953 act is "in addition to and not in substitution of proceedings provided by law where there is desertion or a failure of duty to support." Act of July 13, 1953, P. L. 431, §3, 62 P.S. §2043.33. Both the 1953 act and the 1963 amendment are a sort of overlay placed upon the procedure which existed prior to adoption of this legislation. Thus, it would not be inconsistent, in my view, for this Court to hold that under existing legislation in the out of wedlock situation a jury trial is available upon demand while in an action brought by a wife against her husband a jury trial is not required. It seems conceded that prior to 1953 a support order could be entered for an in wedlock child in a nonjury, summary proceeding under authority of the Act of June 24, 1939, P. L. 872, §733, as amended, 18 P.S. §4733, see *Commonwealth v. Widmeyer,* 149 Pa. Superior Ct. 91, 26 A. 2d 125 (1942), and its predecessor, the Act of April 13, 1867, P. L. 78, §§1-4, see *Commonwealth v. Smith,* 117 Pa. Superior Ct. 318, 178 Atl. 335 (1935).[3] Again, while I wish to express no definitive view on this issue, I also wish it understood that my reading of the majority opinion indicates that its holding does not purport to adjudicate

(1962), construing the Act of May 5, 1911, P. L. 198, §6, as amended, 17 P.S. §626(g). Furthermore, both the New Jersey approach and that of the County Court appear analogous to our statutes providing for compulsory arbitration. See *Smith Case,* 381 Pa. 223, 112 A. 2d 625 (1955).

[3] It may well be that at common law the right to jury trial did not exist in support controversies between husband and wife. See 8 Stat. at Large of Pa. 93 (Mitchell & Flanders 1902).

the validity of in wedlock nonjury proceedings under the 1953 act.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Heaven knows how many children are born of unwed parents in Pennsylvania each year, and Heaven knows also that these children are innocent and, under God, the equal of children born in wedlock. Obviously, they are entitled to live and to have the liberty to pursue happiness. But the majority decision in this case will make it difficult for these storm-tossed infants to assert equality since the decision denies them access to the legal boat launched by the Legislature to keep them buoyant on the sea of adversity over which every illegitimate child must voyage.

It is to be regretted that the Majority Opinion in this case does not squarely face the problem presented in the litigation. The Act of August 14, 1963, P. L. 872, amending the Civil Procedural Support Law of July 13, 1953, P. L. 431, 62 P.S. §2043.31 et seq., provides that any one "to whom a duty of support is owing" may file a Complaint and, after notice to the respondent, "an order may be made, effective from the date of the filing of the Complaint." The duty of support is defined as including "*any* duty of support imposed *or imposable*, by law or by any court order, decree or judgment, whether interlocutory or final, whether incidental to a proceeding for divorce, legal separation, separate maintenance, prosecution for failure to support *a child born out lawful wedlock*, or otherwise." (Emphasis supplied).

The Majority says that a civil court may not impose a support order unless there is first a criminal adjudication that the reputed father sired the child in question. It declares that if the defendant asks for

a jury trial to determine paternity, such trial cannot be denied him. Thus, the Majority nullifies the Act of 1963. It refuses to admit that it has done so, and, indeed, specifically denies that it has found the act unconstitutional, but when one sinks a ship by letting in the sea, it is immaterial whether the sinking is done by opening the stopcocks, knocking a hole into the hull, or running the vessel onto piercing rocks. So far as the Majority's decision is concerned, the Act of 1963 is at the bottom of the ocean. The Majority Opinion is an explanation as to how the shipwreck occurred, not that the Act is still afloat.

The Majority says that, constitutionally, it is impossible, where paternity is denied, to require a putative father to support his child unless he is first found criminally guilty of carnal relationship with the unwed mother of the child. But the statute in no way invites any such interpretation. By no stretch of imagination can the words of the statute be elongated into meaning that a predetermination of the alleged father's responsibility in criminal proceedings must first be established. To so argue is to insist that the Act applies only where the duty of support has already been imposed, but I repeat, the statute defines duty of support as "any duty of support imposed or imposable." Obviously, under any relevant law, an order is *imposable* on the parent of a child for its support, *legitimate or illegitimate*.

The reasoning of the Majority in this respect not only unravels in a field of sophistry, but it also pays no heed to history. I don't think anyone can deny that there are few problems of today that cannot be more easily resolved by considering what went on yesterday. Let us see, then, how civilization, down through the ages, has treated the subject of support

for illegitimate children, which obviously is not a new one.

As we read the chronicles of the Common Law era, we encounter such monstrosities as punishment for witchcraft, trial by ordeal, and ostracism of children born out of wedlock. These children were called bastards. At first the term was merely a philological designation, meaning that the child was *filius nullius*, the son of nobody, or *filius populi*, the son of the people. Since anything which belongs to nobody, or to everybody, receives scant consideration, it was not long until the word "bastard" connoted the absence of qualities otherwise inherent in children born in wedlock. Thus, the term "bastard" began to acquire a disreputable sense: the illegitimate child was not merely tagged as being without a legally declared father, he was also regarded as lacking some of the attributes essential to worthy membership in society. The child became a pariah, an incomplete person, a bastard. So low in social status was this bastard placed that, eventually, a person born of wedded parents but who was wanting in moral substance, was, by connotation, invested with the resounding handle of bastard.

And then, as time passed, the word bastard degenerated into an opprobrious epithet, which it still is. But why must a child be called a bastard, with all its implications of dishonesty, treachery and general unreliability, merely because, through no fault of his own, he came into this world without the blessing of a wedding ring? If the word bastard is to be employed in its connotational sense, it should apply to the father rather than to the child. Thus, the father of the illegitimate child is the bastard, especially when he fails to meet his moral and legal obligations to his unoffending offspring.

But, be that as it may, the Common Law, as it gradually emerged from the cruelties, superstitions

and illogicalities of medieval customs, began to recognize the moral responsibility owed by the community to illegitimate children, and, in that recognition, it decided to impose a financial responsibility on the bastard father. This financial responsibility was in no way associated with the moral turpitude attached to the act which preceded the birth of the child. The offense of carnality beyond matrimonial relationship was a matter for the State to consider. Thus arose the crime of fornication for which the State imposed a penalty.

The Church, the State and all those concerned for the well-being of the country and the community realized that promiscuity between men and women not married to one another would not only corrupt the morals of society, but eventually weaken the very foundations of government which must be built on the solid rock of moral stability. Men of statecraft and of ecclesiastical authority saw that a society of license between the sexes could only degenerate into anarchy and unweaving of the ties of accountability to governmental authority. Hence, fornication and adultery became crimes punishable by the State. However, the product of that criminal association had nothing to do with the amoral intentions of its originators.

The child born in a house which did not display on its walls a framed marriage certificate had the right to demand that he be supported by the man responsible for his being brought into that house. This was a civil right, a natural right, and it had nothing to do with punishing the father for his sinful improvidence. The victim of an assault and battery has the right to civil damages from his assailant, which has no bearing on the right of the State to criminally prosecute the assailant. If two arsonists conspire to burn down a house, the owner of the house is entitled to

sue for the value of his house, entirely apart from whether the State does or does not criminally prosecute the arsonists. This is elementary.

And it is elementary also that the father of a child has the legal duty to support him regardless as to whether or not the State punishes him for transgression of the criminal code. The Majority Opinion in this case overlooks this distinction and misleads itself into believing that because fornication and bastardy are linked together in the criminal code, they are not severable in the procedural application of general law. Not only does the Majority ignore this distinction between civil and criminal law, but it also closes its eyes to history, precedent, and custom which goes back so far that memory runneth not to the contrary.

Sir William Blackstone, who is the first and ultimate authority on interpretation of the Common Law, stated in his deathless Commentaries, which was the bible of all law scholars when the American law began to crystallize into a jurisprudence of its own: "though bastards are not looked upon as children to any civil purposes, yet the ties of nature, of which maintenance is one, are not so easily dissolved . . . *two justices out of sessions, upon original application to them, may take order for the keeping of the bastard, by charging the mother or the reputed father with the payment of money or other sustentation for that purpose.*" (Commentaries, Vol. 1, p. 458)

"But before we quit this subject, we must take notice of the temporal punishment for having bastard children, considered in a criminal light; for *with regard to the maintenance of such illegitimate offspring, which is a civil concern,* we have formerly spoken at large." (Commentaries, Vol. 4, p. 65.) (Emphasis supplied).

Blackstone cited Baron Puffendorf's "Of the Law of Nature and Nations" in this connection:

"But we are rather inclined to think That Parents be under a perfect obligation to maintain their Children, so long as they are unable to maintain themselves; and the Duty seems to be laid upon them not only by Nature itself, but by their own proper Act, in bringing them into the World . . . Furthermore, Maintenance is due not to legitimate children alone; but to Natural and even to incestuous Issue. For what reason is there that the poor innocent Infant shall be suffered to famish for another's Sin?" (Translation into English by Basil Kennett, London MDCCXXIX, Chapter XI, IV and VI page 428).

The Encyclopedia Britannica, in its treatment of the subject of bastards, says that under English law the obligation of the father of an illegitimate child to support him was not intended "as a penal effect against the man, but solely to prevent the cost of maintenance of the bastard child from calling upon the parish."

The moral and natural obligation to treat legitimate and illegitimate children equally, dates back to the days of the Old Testament. When Jacob made his journey to Egypt to meet his son, Joseph, he took with him "all his seed," making no distinction between those who were born of wives and those born of concubines. (Genesis, Chapter 46). The fathers of our Commonwealth, steeped in the teachings of the Bible and strict in their enforcement of the moral code, never imposed punishment on the father of a child conceived out of wedlock. They did punish him for gratification of the flesh by having a husky constable inflict 21 lashes on the bare back of the culprit "well laid on" (with the alternative of a heavy fine), but if a child resulted from the lustful act, the father did not need to fear the whip further. He was merely required to "give security . . . to perform such order for the mainte-

nance of such child as the justices of the peace in their sessions shall direct and appoint." (Act of January 12, 1705-06, 2 Statutes at Large, 180.)

Thus, while conviction of fornication led to a criminal penalty, the fathering of a child, fruit of the escapade, entailed only the civil obligation of supporting the child. This is the definitive and irrefutable history of maintenance of illegitimate children in the Common Law, prior to the adoption of the Constitution of Pennsylvania, and the Majority may not assume its nonexistence by being silent on the subject.

The indisputable historical fact is that in the entire career of Pennsylvania, there never was a statute which made it a crime to father a child. As Judge FLOOD of the Superior Court well ^xpressed it in his Opinion upholding the Act of 1963: " 'A crime, in the strict legal sense of the word is an act, forbidden by law under pain of punishment.' Stephen, Criminal Law 1. Fathering an illegitimate child has never been a crime in this sense in Pennsylvania. Fornication is the crime, and not the resultant birth of the child." (204 Pa. Superior Ct. 420)

The authoritative work of American Jurisprudence specifically declares: "In jurisdictions where the purpose of a filiation proceeding is simply to compel the putative father to support his child, it is almost uniformly held to be a civil proceeding, by nature, and governed by the rules of procedure applicable to civil actions." (10 Am. Jur. 2d Bastards §75.)

The highly respected reference work, Corpus Juris, declares that the purpose of bastardy proceedings "is not to impose punishment for an immoral or unlawful act, but is merely to compel the putative father to provide for the support and maintenance of his offspring, and thus to prevent it from becoming a public charge." (10 C.J.S. Bastards, §33).

Paternity proceedings are purely statutory and in 24 States, the proceedings are civil.* In these states the defendant is not punished because of paternity; he is merely required to perform his fatherly duty of supporting his child. Certainly no one will dispute that, physiologically and under nature's laws, the procreator of an illegitimate child is as much his father as the procreator of a legitimate child.

Proud as Pennsylvania may be of its independence in asserting law, it cannot climb a high horse and declare itself unconcerned with what is happening in other States, particularly where basic rights of humanity are involved. For instance, the Supreme Court of Connecticut stated in *Pelak v. Karpa*, 146 Conn. 370: "It is settled law that our bastardy procedure . . . while permitting the arrest of the body of the defendant for purposes of security, is fundamentally a civil action, to which the general rules governing civil actions are applicable."

In *Green v. Commonwealth*, 297 Ky. 675, 180 S.W. 2d 865, it was held that where a bastardy action is not commenced by a warrant of arrest it "is a civil proceeding." In *Easton v. Easton*, 112 Maine 106, 90 A. 977, a filiation proceeding was declared to be a civil proceeding. In *Land v. State*, 84 Ark. 199, 105 S.W. 90, the Court stated that bastardy proceedings are "of civil, not criminal nature" even though failure to comply with an order of support may result in commitment to jail.

But we do not need to scan the outer horizon for views on this subject. Let us see what has happened in our own State. In *Commonwealth v. Dunnick*, 204 Pa. Superior Ct. 58, 62, Judge WOODSIDE, speaking for the Superior Court, said: "In failure to support a child born out of lawful wedlock *the* issue is the failure to

---

* Schatkin, Disputed Paternity Proceedings (3d ed.), p. 66.

support, which occurs not at the approximate time nor as a result of the fornication but at a time after the child is born, and as a result of the defendant's conduct thereafter . . . Bastardy carries no punishment except an order to support the child and is, in effect if not in law, more civil than criminal."

Nor in our own Court has the brain of wisdom failed to pulsate with the heartbeat of humanity, which is, or should be, as much a part of the law of Pennsylvania as its statutes and court decisions. In the case of *Halsey's Appeal,* 120 Pa. 209, the expenditure of moneys from the estate of Eli Siegfried, a mentally incompetent, was authorized "for the support and maintenance of his family and for the education of his minor children." Objection was made to the disbursement of funds for the support of Siegfried's illegitimate children. Chief Justice GORDON reproved the objectors: "What if this family was illegitimate? The children, at least, were those of Siegfried and could not be turned out to starve just because they were bastards?"

Although insisting that it is not deciding the issue in this case on the basis of constitutionality or unconstitutionality, the Majority with little regard for logic, founds its decision on the assertion that the defendants here may not be required to support their children under the Act of 1963 because the Act offends against the Pennsylvania Constitution which provides for jury trials. Art. I, Sec. 6 of the Constitution declares that "trial by jury shall be as heretofore." But putative fathers of illegitimate children were never entitled to jury trials in Pennsylvania, in order to hold them liable for support of their children. You cannot have today what was "heretofore" when there was no "heretofore." Judge FLOOD properly said in this connection: "It is clear that the determination of paterni-

ty as a preliminary to an order of support did not require a jury trial at common law. Stat. 18 Eliz. 3, supra. The mere fact that it was usually determined as an incident, or a supplement, to a prosecution for fornication under the Pennsylvania law prior to 1776 does not make this determination one which must be made only by a jury." (204 Pa. Superior Ct. 420)

This Court, in the recent case of *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, defined "heretofore" as follows: "[T]he individual is entitled to a public trial by an impartial jury of the vicinage in every situation in which he would have been entitled to such a trial *at the time of the adoption of our State Constitution of 1790 . . ."* (Emphasis supplied).

The determination of paternity is simply a biological question, to be resolved for the purpose of enforcing a civil duty, that is, the obligation to support a dependent child, wholly unrelated to punishment for crime. This has been the history of enforcement of support for illegitimate children throughout the course of Pennsylvania law. During our colonial period, paternity, as I have already shown, was determined by Justices of the Peace, and not by a jury. The Majority chooses to disregard this historical verity, but it is in the books for everyone to read, and especially the children who are being denied support, when they are old enough and can get out of their eyes the tears which blind them as they grope for the supposedly helping hand of the law, intended to be based on justice.

Nor are the defendants entitled to a jury trial under Art. I, Sec. 9 of the Constitution which reads: "In all criminal prosecutions the accused hath a right . . . in prosecutions by indictment or information, (to) a speedy public trial by an impartial jury of the vicinage."

It must be quite obvious that the procedure set forth in the Act of 1963 to collect support money from the father of an illegitimate child is not a "criminal prosecution." Nor is there any "prosecution by indictment or information." No punishment is sought.

Paternity is often resolved without a jury trial. For instance, the Orphans' Court may make a determination as to legitimate paternity on a question of inheritance by intestacy. The question of paternity may also be resolved by the Common Pleas Court in an action for annulment for fraudulent representaton as to parenthood, or in a dispute as to custody.

I have always been, and will continue to be, unswervingly loyal to the assurance of jury trials where liberty is involved, as guaranteed by the Constitutions of the United States and Pennsylvania, but such guarantee does not apply in a civil action where the only objective is determination of financial support for dependent children. It is also to be noted, as stated in *Commonwealth v. Bechtel*, 384 Pa. 184, that, "Constitutional guarantee of trial by jury does not prevent the legislature (a) from creating or providing modes . . . other than a jury trial for the determination or adjustment of rights and liabilities which *had not been* triable by jury prior to the Constitution . . . or (b) from creating new offenses." (Emphasis supplied.)

The Majority Opinion quotes from a case in which trial by jury has been referred to as "the jewel of Anglo-Saxon jurisprudence." This is true, but I would like to observe that a jewel is something to be worn and not to be swallowed. The Majority would force down the throat of Philadelphia County jury trials beyond its capacity to digest. It was to prevent this monumental indigestion that the Legislature enacted the law of 1963, which the Majority says it will not unconstitutionalize, yet cripples it with an interpreta-

tion that makes it as ineffective as a jet engine without breathing nostrils.

The interpretation given by the Majority to the Act of 1963 makes it utterly meaningless, and we have no right to say that the Legislature has done an utterly vain thing. (Act of May 28, 1937, P. L. 1019, art. IV, §51, 46 P.S. §551.) But, the Majority argues, the act of 1963 would have meaning in that it would leave to the defendant himself the determination of paternity and, upon acknowledging it, he would be authorized to dispute the amount of the order imposed by the Court. Such an interpretation makes a mockery of a court of law which, in arriving at a decision, is guided by evidence and by principles of jurisprudence, and not by the arbitrary will of the litigant.

Nor can it be ignored in the disposition of the litigation in this case that a Court, in determining paternity, is aided in its deliberations by the scientifically developed Uniform Act on Blood Tests to Determine Paternity, Act of July 13, 1961, P. L. 587, 28 PS §307.1 et seq.

The Majority, in its rationalizing, has looked at this case with a microscope, which is praiseworthy, but it should have used a telescope as well. It should have surveyed the entire panorama of the issue, as did the Legislature; it should have observed all the legal and sociological landmarks involved, and note how and whether they properly fit one into the other. The Majority examined the trees, their trunks, branches, and leaves, but it lost sight of the forest. It did not see the 13,000 untried criminal indictments pending in Philadelphia County, it failed to perceive the import of approximately 7,000 illegitimate babies being born in Philadelphia every year. If each of the 7,000 putative fathers demands a jury trial, it would not be long until such a backlog of untried cases, added to the

criminal cases awaiting trial, would pile up to such a height that the children involved would metamorphically be ripe for old age pensions by the time their errant fathers were brought to book.

Another factor considered by the Legislature is that if the reputed illegitimate fathers hold civil service jobs, and a jury finds them guilty of a criminal offense, they lose their jobs and the taxpayers are required to support children who, otherwise, would be maintained by their fathers. This realization is not a compromise with the law, it is an acknowledgment of realities, and law is not law if it operates in a vacuum. The Majority ignores these realities even though they were argued before our Court and are discussed in the briefs filed with our Court.

Our government is tripartite and each of the branches is empowered to check on the other two, in order to prevent an assumption of authority not assigned to it by the Constitution. I believe that the Majority here has encroached on the domain of the Legislature. The General Assembly of Pennsylvania is dealing with an important social problem. It has recognized the desperate need in the large urban centers, such as Philadelphia, to expedite the adjudication of cases which have to do with the support of children. This Court, shutting its eyes to the problem the Legislature has confronted, is by the most tenuous kind of artificial reasoning, tossing a wrench into the machinery of orderly administration of legal processes.

What will the Majority decision accomplish? It will throw the administration of the County Court of Philadelphia into indescribable chaos. Defendants will demand jury trials, not because they entertain the slightest hope or chance to be acquitted but merely to stave off the inevitable. The machinery of the courts in this metropolitan center will simply clog.

And why is this being done? Law is supposed to be common sense. Where is the common sense in the Majority Opinion?

The Majority Opinion makes me think of a person aboard a sinking ship who, instead of leaping overboard clutching a lifesaver, decides to wrap his arms around the anchor. Every year thousands of illegitimate children are born in Pennsylvania. These children are entitled to life. It is not their sin they were born out of wedlock, they are still children of God, they are still human beings, and the law should require their fathers to support them.

What is the Majority doing, under the law, about these children? What is it doing about this Court's responsibility to respect the laws passed by the Legislature? The Majority is attaching that responsibility to the anchor of the sinking ship.

As soon as the order of this Court nullifying the Act of 1963, is promulgated, the County Court of Philadelphia will be flooded with fornication and bastardy cases. Add 7,000 potential jury cases per year to the already overburdened ship of jury trials and it will sink, it will plummet to the bottom, and what will happen to the innocent children in the meanwhile? Obviously, society cannot let them drown. So, government will provide for their maintenance, while the culpable fathers will go about their promiscuous affairs, wholly unworried about the criminal indictments against them which perhaps may never come to trial, or if they do, so much time will have elapsed since their sin that conviction may be problematical or perhaps impossible. All this is as clear as the City Hall thrusting its tower into Philadelphia's skies but apparently is not clear to the Majority which treats this vital problem academically and theoretically as if it were only an exercise in dialectics, instead of the very viscera of society.

I believe I have shown that the Act of 1963 is constitutional (indeed the Majority does not openly question its constitutionality); I have demonstrated that there was and is a desperate need for the Act; I have reviewed the history of the subject of support for illegitimate children and have pointed out that imposition of support orders was never a criminal adjudication, and I have revealed that this Court has no authority, under the guise of interpreting legislation, to rewrite it (*Halko v. Foster Township School District*, 374 Pa. 269). What I have stated here is incontrovertible and irrefutable. What does the Majority show for its drastic counter-decision?

The Majority Opinion is five pages long. Two pages are devoted to a dry account of why the case is here before us; one page tells the world how reluctant the Majority is, to jettison an Act on constitutional grounds, while throwing the Act overboard to the sharks of interpretation; another page indulges in a reckless guess as to why the Legislature passed the Act of 1963, and the final page cites, in support of its conclusions, cases which are as far removed from the issues here as *Alice in Wonderland* is from *Euclid's Elements of Geometry*.

For instance, *Commonwealth v. Hall*, 291 Pa. 341, cited by the Majority, is a case where the defendant was charged with cutting, stabbing and wounding his victim. Such a case was always tried by a jury; support for a child was *never* tried by a jury. *Commonwealth v. Turchetta*, 404 Pa. 41, had to do with a defendant who pleaded guilty to false pretense and conspiracy and then changed his plea to not guilty, which has about as much association with what is involved here before us as the *Marquis of Queensberry Rules* have to do with playing bridge. *Gordon v. Biesinger*, 335 Pa. 1, deals with the powers of the Secretary of

Banking and the rights of shareholders in bank stock. Then *Felt v. Cook*, 95 Pa. 247 and *Rhines v. Clark*, 51 Pa. 96, were apparently just shoveled to fill out the fifth page of the Opinion.

While length of an Opinion does not of itself indicate depth of study, still it would appear to me that when this Court ignores 300 years of legal history, decapitates an Act of the Legislature, and denies to thousands of infants the right to an immediate milk bottle from a responsible source, something more than appears in the Majority Opinion should be submitted for the enlightenment of administrative officials, and for the guidance of the lower courts. When this decision becomes public, the lawyer, the judge, the unwed mothers and the hapless forgotten children themselves, when they are old enough to read, will ask many questions as to why this Court reached a conclusion so diametrically opposed to the solemn finding of the Legislature, a sister branch of government.

These worried persons will search through the Majority Opinion of the Court to find answers to the questions: Why is the Court so indifferent to precedent, so violative of the simplest rules of logic and common sense, so unconcerned about the catastrophic effects of the decision? I would say to these harried individuals not to lose time and patience in that search, because the answers simply are not there.

This could well mark the termination of my Dissenting Opinion but my ink bottle bubbles with a few more words of protest on account of the Concurring Opinion filed by Justice COHEN who adds to the incongruities of the Majority Opinion a few obnoxious irrelevancies of his own. Justice COHEN finds fault, because, in the conscientious discharge of our appellate duties, this Court, speaking through the Chief Justice, allowed the lower Court to present its reasons as to why the Act of August 14, 1963, should be sustained.

Justice COHEN says he sees "no place in our judi-
cial system for the intrusion of lower tribunals in pro-
ceedings of our Court." I cannot see why the County
Court of Philadelphia, one of the ablest and the most
respected courts in the country, should be charged with
"intrusion" because it seeks assistance and guidance
in discharging its momentous duties of finding support
and maintenance for the thousands of helpless children
flocking into the courtyard of its jurisdiction.

Justice COHEN indicates that the briefs and argu-
ments presented by the County Court through distin-
guished and able counsel only "tend to confuse and
disrupt." I am sure they did not confuse or disrupt
me, and I heard no other member of this Court com-
plain that he had been confused or disrupted by the
enlightening presentation of Attorney David Berger
who, as Chief Justice BELL in his own Concurring
Opinion well points out, enjoys the honor of having
been a Chancellor of the Philadelphia Bar Associa-
tion, and Solicitor for the City of Philadelphia and
who, in addition, unquestionably is one of the shining
lights of the Philadelphia Bar.

Justice COHEN says that the action of the County
Court in presenting to this Court its reasons for de-
siring an affirmation of the Act of 1963 "indicates
overtones of objectives not compatible with justice."
If Justice COHEN heard overtones as Attorney Berger
argued his case, he has a keener ear for such acousti-
cal phenomena than I. Indeed, all I heard was an
absorbingly interesting argument presented by a
trained advocate, in a well modulated voice that har-
monized excellently with the whole orchestration of
the issue produced so ably by all parties concerned.

Then, in a non sequitur, that would make, in com-
parison, the announcement of 5 as the total of 2 and
2, the perfection of arithmetical computation, Justice

COHEN said that the "unusual display of personal interest by a lower court demonstrates that the Court was incompetent to have heard the litigation in the first instance."

Why a presentation of argument in our Court by counsel should make the lower Court "incompetent to have heard the litigation" Justice COHEN does not explain. Or even attempt to explain and, in this, he demonstrates fortuitous wisdom, because the two propositions are as far removed from one another in logic as Socratism and Hegelianism. The lawyer who argued the case for the County Court could have been one of the worst lawyers in Philadelphia (whereas, in fact, he is one of the best), and this still would not demonstrate that the Court of original jurisdiction was incompetent to pass on the litigation.

As a matter of stark objectivity, it so happens that the Judge who heard the litigation in the first instance, is an extremely competent judge, a conscientious judge, a scholarly judge, a patient judge who is renowned for her juridical qualities. When she was Assistant District Attorney of Philadelphia County she often appeared before our Court and she never failed to impress with her thorough knowledge of the facts and the law in the case before us, her firm grasp of the relevant authorities, and the clear, cogent manner with which she always presented the views of the Commonwealth for which she spoke.

It would seem that Justice COHEN did not read the transcripts of the record in these two cases in the County Court or, despite the headlongism with which he plunged into the bizarre conclusions already above noted, he could never have charged the Judge in the lower Court with "incompetence to have heard the litigation." As one reads the record in both cases, one can only be struck with admiration by the fairness of

the trial judge, the zeal with which she sought out the truth, and the profound depth of her study of the delicate issues involved.

Judge JUANITA KIDD STOUT wrote Opinions in both cases. In them she traced the history of legislation on the subject and she analyzed the pertinent cases. I found her Opinions extremely informative, and helpful in the extreme. They were of the highest quality from every point of evaluation of a trial judge's report on a case over which he or she has presided.

Justice COHEN says that he "severely criticizes" the County Court "that activated the intervention." This is a censure levelled at Judge ADRIAN BONNELLY, the President Judge of the County Court of Philadelphia, because it was he who petitioned for the intervention. Judge BONNELLY could have avoided becoming a target for Justice COHEN's animadversion by doing nothing. With indifference and luxurious resignation he could have dismissed from his mind all concern about the children entrusted to the care of his Court, once the litigation had left his immediate jurisdiction. But Judge. BONNELLY is not that kind of a judge or person. I would say that Judge BONNELLY is the ideal judge—learned, industrious, conscientious, compassionate—with every centimeter of his bustling, dynamic figure dedicated to the sacred cause of justice.

In the annual report of his Court for the year 1967, Judge BONNELLY said: "Our Court—with its deep social conscience and its broad-gauged jurisdiction over practically all matters relating to the family—has always observed the right of a child to due process."

It was because of this passionate devotion to due process in behalf of children, that this veteran, illustrious jurist asked to intervene in this Court for a determination of the rights of the helpless tots crying at the doors of the courthouse for justice. Justice

COHEN "severely criticizes" Judge BONNELLY for this continuing concern for the wards of his court. I, on the contrary, pin on Judge BONNELLY the accolade of humanity, without which law is meaningless and courthouses but aggregations of stone and mortar.

It must be said in Justice COHEN's behalf that he has hurled his carping thunderbolts with no visible prejudice or discrimination since he has treated all his targets with equal disdain. Thus, he casts at his own Court brickbats as solid and substantial as those which he bounced off the walls of the County Court. Boldly he states he "severely criticizes" this Court for allowing what he calls "such an unusual procedure." This "severe criticism" by Justice COHEN of the Supreme Court of Pennsylvania is not to be taken too seriously, but it is lamentable that he is not more familiar with the history of this august tribunal. Had he possessed that historical knowledge, he would know that it is not unprecedented for a lower Court to present to this Court, in cases of extreme public importance, which this one surely is, its evaluation of the issues.

Justice COHEN does not say that the lower Court presented anything which was improper, he does not assert that the data it submitted was unreliable. He only indicates that he possibly prefers the lower Court's viewpoint be shrouded in darkness, instead of light. I do not know that any other member of this Court shares Justice COHEN's aversion to extra illumination on a case of this public magnitude. But, so that there may be no doubt about my position I wish to record that I am happy at all times to receive assistance from the original Court because, not being blessed with the omniscience which Justice COHEN believes he possesses, I seek as much light as possible from the tribunal which, having heard a case from its initial stages,

knows better than I, the facts and the circumstances surrounding and permeating the legal contest.

In conclusion I wish to commend President Judge ADRIAN BONNELLY for his solicitude for the thousands of children whose destiny will be affected by this litigation, I congratulate Judge JUANITA KIDD STOUT on her superbly able handling of all the factual and legal details of a difficult case, I felicitate Attorney David Berger for the splendid services he rendered and of the valuable time he gave to a most worthy cause, his remuneration being that of satisfaction in a sense of duty well fulfilled.

I offer a tribute to this valiant trio for championing the cause of the little children who are not illegitimate in the eyes of Heaven, "for such is the kingdom of God."